**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

COVERTECH FABRICATING, INC.,    )
          )      **CIVIL ACTION NO. 3:13-150**
        Plaintiff,   )
          )      **JUDGE KIM R. GIBSON**
    v.         )
          )
TVM BUILDING PRODUCTS, INC.,    )
          )
        Defendant.   )

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

This matter comes before the Court upon conclusion of a bench trial held from October 20, 2014 until October 24, 2014. The parties filed their proposed findings of fact and conclusions of law on April 9, 2015. (ECF Nos. 96 and 97). The parties filed responses on May 21, 2015. (ECF Nos. 100 and 101). The matter is now ripe for disposition.

### II. BACKGROUND

#### a. Procedural

Covertech Fabricating filed a complaint against TVM Canada and TVM Products in the Middle District of Pennsylvania on May 21, 2013. (ECF No. 1). Covertech filed a stipulation of dismissal without prejudice of its claims against TVM Canada on July 8, 2013. (ECF No. 11 at 3). The parties also stipulated to transfer the remainder of the action to the Western District of Pennsylvania pursuant to 28 U.S.C. § 1406(a). (ECF No. 12). The action was transferred to this judicial district on July 11, 2013. (ECF No. 13).

### b. Jurisdiction and Venue

This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332(a)(2) and (c)(1) because the parties are of diverse citizenship and the amount in controversy exceeds $75,000, excluding interest and costs. (ECF No. 1 at 5). This Court also has subject matter jurisdiction over the claims pursuant to 28 U.S.C. §§ 1331, 1338(b), and 15 U.S.C. § 1121 because this action involves claims for infringement of a federally registered trademark in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114; for federal unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and for dilution of a federally registered trademark in violation of § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). This Court also exercises supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same "case or controversy" under Article III of the United States Constitution.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because TVM is subject to personal jurisdiction here under 28 U.S.C. § 1391(b)(2), and because a substantial part of the events or omissions giving rise to the claims arose in the Western District of Pennsylvania.

### III. LEGAL STANDARD

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the court may enter judgment following a trial without a jury. *See* FED. R. CIV. P. 52(a). In making a decision following a bench trial, "[t]he court must find the facts specially and state its conclusions of law separately." *Id.; see also In re Frescati Shipping Co., Ltd.*, 718 F.3d 184, 196 (3d Cir.

2013). Accordingly, the court will discuss its factual findings and then proceed to conclusions of law.

## IV. FACTUAL FINDINGS

### a. The parties involved

#### i. Covertech Fabricating, Inc.

The Plaintiff in this matter is Covertech Fabricating, Inc. ("Covertech"), a Canadian corporation with its principal place of business in Toronto, Ontario, Canada. (ECF No. 87, Trial Tr., at 40:3–4).

The President and owner of Covertech is Furio Orologio. (ECF No. 90, Trial Tr., at 211:11). Mr. Orologio has been an owner and the President of Covertech since its inception in 1990. (*Id.* at 211:16–18). He oversees every aspect of running the company, including the financials, banking, production and sales. (*Id.* at 211:19–21). Jonathan Starr is the Vice President and an owner of Covertech. He has been with Covertech since 1990 and is presently responsible for the sales and marketing aspects of the company. (ECF No. 87, Trial Tr., at 40:1). Peter Clarke works for Covertech and is responsible for sales in Canada and the northeast United States. (ECF No. 88, Trial Tr., at 4:19–22). Prior to working for Covertech, Mr. Clarke was employed by TVM as Vice President of Sales in Canada from June 2005 through May 31, 2009. (*Id.* at 30:13–15). Kelly Myers is the National Sales Manager for Covertech and has been employed by Covertech for the past seven years. Prior to working for Covertech, he was employed at TVM from May 2000 through January 2006. (*Id.* at 128:23–129:3).

### ii.  TVM Building Products, Inc.

The Defendant in this matter is TVM Building Products, Inc. ("TVM"). TVM is a distributor of specialty building products including insulation and sealants and maintains its principal office in Johnstown, Pennsylvania. (ECF No. 89, Trial Tr., at 89:6–8).

Michael Boulding has been the President of TVM Building Products since its inception in 1998. (*Id.* at 7:3–8:5).  In about 1998, Mr. Boulding met with Mr. Orologio to discuss the marketing of Covertech's products by TVM. (ECF No. 90, Trial Tr., at 219:11–220:19). At that time, TVM was a marketing company. (ECF No. 87, Trial Tr., at 47:19–48:2). TVM did not manufacture any insulation products. (ECF No. 89, Trial Tr., at 15:5–7).

### b.  Covertech's Reflective Insulation and Protective Packaging Business

Covertech manufactures protective packaging and reflective insulation. (ECF No. 87, Trial Tr., at 40:17–23). Covertech extrudes polyethylene film and converts it into different products. (*Id.*). Covertech manufactures and sells extruded film, various protective packaging products, such as bubble wrap, and various products relating to reflective insulation, which are polyethylene bubble products with foil facings laminated to them. (*Id.* at 40:18–41:4).

Covertech began manufacturing reflective insulation products in the mid-1990s and sells its products in the United States, Canada, and around the world. (*Id.* at 41:5–9). Covertech started manufacturing and selling reflective insulation in 1994 or 1995 to be used on walls, ceilings, floors, and around ductwork. (*Id.* at 41:10–15). Covertech began selling reflective insulation products in the United States in 1998 or 1999. (*Id.* at 47:12–15).

### c. Reflective insulation

Covertech's reflective insulation product is called rFOIL. (ECF No. 87, Trial Tr., at 41:20–22). Covertech has been using the rFOIL mark in interstate commerce since about 1998. (*Id.* at 14:4–6). The mark has been associated with Covertech products since then. (*Id.* at 53:22–24). Covertech has been using the rFOIL mark continuously throughout the United States since 1998 and it uses it today. (*Id.* at 66:25–67:7). Covertech came up with the name rFOIL. It developed the name with a marketing company prior to working with TVM. (*Id.* at 62:2–4).

Covertech sells its reflective insulation products under its rFOIL brand. (*Id.* at 41:23–42:7). Covertech has a number of different product names that it sells under the rFOIL brand, including ULTRA NT RADIANT BARRIER, NT RADIANT BARRIER, CONCRETE BARRIER FOIL, CONCRETE UNDERPAD, and ULTRA CONCRETE UNDERPAD. (*Id.*).

Pursuant to an application filed by Covertech on September 18, 1997, the United States Patent and Trademark Office ("USPTO") added the trademark rFOIL to its principal register on April 17, 2001 as Reg. No. 2,444,633. (ECF No. 97 at 5, citing Exs. 1, 114, ¶ 1). The rFOIL trademark is incontestable pursuant to 15 U.S.C. § 1065. (*Id.*, citing Exs. 1, 114, ¶ 2). After Covertech had registered the rFOIL mark, Covertech immediately told TVM about it. (*Id.* at 66:15–24).

### d. CONCRETE BARRIER

Covertech has been using the CONCRETE BARRIER mark in interstate commerce since about 1998. (ECF No. 87, Trial Tr., at 53:10–24). Covertech has used the mark continuously throughout the United States since 1998 and uses it today. (*Id.* at 66:25–67:7). Covertech's CONCRETE BARRIER products are also referred to as CBF, which stands for CONCRETE BARRIER Foil. (*Id.* at 52:19–23, 53:18–20). Covertech has sold millions of dollars of its CONCRETE BARRIER product in the United States. (*Id.* at 74:2–4). According to Covertech's National Sales Manager, Kelly Myers, the CONCRETE BARRIER product is "huge" and one of Covertech's "marquee products." (ECF No. 88, Trial Tr., at 147:22–148:10).

Covertech registered the trademark "CONCRETE BARRIER" with the USPTO by filing an application on June 17, 2003. (Joint Stipulation, ECF No. 79 at 1). The mark was added to the supplemental register on September 20, 2005 as Reg. No. 2,999,338. (*Id.*; Exs. 3, 114 ¶ 3). Pursuant to an application filed by Covertech on September 10, 2013, the USPTO added the trademark CONCRETE BARRIER to its principal register on June 3, 2014 as Reg. No. 4,542,586. (*Id.*; Exs. 2, 114 ¶ 4).

After Covertech had registered the CONCRETE BARRIER mark, it immediately told TVM about it. (ECF No. 87, Trial Tr., at 66:15-24). Covertech sells its CONCRETE BARRIER product using the product number 1620. (*Id.* at 45:3–7; Ex. 117). Since Covertech began using that number, it has always been associated with Covertech's CONCRETE BARRIER product. (*Id.* at 70:3–5).

### e. ULTRA CONCRETE UNDERPAD and CONCRETE UNDERPAD

Covertech has been using the CONCRETE UNDERPAD and ULTRA CONCRETE UNDERPAD marks in interstate commerce since about 2003 or 2004. (*Id.* at 53:10–24, 83:11–13). The marks have been associated with Covertech products since then. (*Id.*). Covertech has been using the CONCRETE UNDERPAD mark continuously throughout the United States since then and still uses it today. (*Id.* at 83:23–25). The product number associated with Covertech's CONCRETE UNDERPAD mark is 4620, and the product number associated with Covertech's ULTRA CONCRETE UNDERPAD mark is 4320. (*Id.* at 45:8–9, 46:1–7; Exs. 118, 119). Covertech has sold millions of dollars using the CONCRETE UNDERPAD marks over the years. (*Id.* at 86:1–3).

### f. ULTRA NT RADIANT BARRIER and NT RADIANT BARRIER

Covertech filed an application with the Canadian Intellectual Property Office on July 6, 2009, to register the trademark "ULTRA NT RADIANT BARRIER." The Canadian Intellectual Property Office registered the trademark on October 13, 2010. (Joint Stipulation, ECF No. 79 at 2). On July 8, 2010 Mr. Starr told Mr. Boulding that the Canadian Intellectual Property Office had granted Covertech the trade name ULTRA NT RADIANT BARRIER in Canada. (ECF No. 97, Trial Tr., at 113:17–114:8).

TVM filed an application on March 30, 2011 with the United States Patent and Trademark Office ("USPTO") to register the trademark "ULTRA NT RADIANT BARRIER," which was added to the principal register on January 17, 2012 as Reg. No. 4,086,776. (Joint Stipulation, ECF No. 79 at 2). Pursuant to an application filed on the same

day, TVM is also the registered owner of the trademark "ULTRA NT SCIF BARRIER," which was added to the USPTO's principal register on January 17, 2012. (*Id.*).

NT RADIANT BARRIER and ULTRA NT RADIANT BARRIER are brands used for Covertech products that keep radiant heat out of attics. Covertech's ULTRA NT RADIANT BARRIER product is also used in SCIF applications, which are sensitive compartmental information facilities. (ECF No. 87, Trial Tr., at 74:5-13; Exs. 115, 116). In addition, Covertech's ULTRA NT RADIANT BARRIER product is used to help keep electronic signals from coming in or out of a building. (*Id.* at 43:21–44:3). Covertech developed and used the ULTRA NT RADIANT BARRIER brand. (*Id.* at 106:7–17).

The product number associated with Covertech's NT RADIANT BARRIER mark is 4800, and the product number associated with Covertech's ULTRA NT RADIANT BARRIER mark is 1800. (*Id.* at 74:14–19). The NT RADIANT BARRIER and ULTRA NT RADIANT BARRIER marks have been used continuously in the United States by Covertech since at least as early as 2003, and Covertech still uses them today. (*Id.* at 53:10-24; 74:18–23, 107:10–111:23; Exs. 5, 6, 81). Covertech has sold hundreds of thousands of dollars of its ULTRA NT RADIANT BARRIER product. (ECF No. 87, Trial Tr., 82:16-19). Covertech's ULTRA NT RADIANT BARRIER product is specified by the United States government for use in SCIF applications in government buildings. (*Id.* at 120:21–124:13; Exs. 15, 16).

Other than in connection with TVM's distribution of Covertech's products, Covertech never gave permission to TVM to use the ULTRA NT RADIANT BARRIER mark in the United States. (ECF No. 87, Trial Tr., at 57:6–9, 114:22–24).

### g. Product Numbers

TVM developed a product numbering system to replace Covertech's existing product numbering system which was not able to handle the additional product lines. (ECF No. 89, Trial Tr., at 31:7–33:1). According to Mr. Orologio, he initiated the development of the new codes because there were errors in the orders coming to Covertech. (ECF No. 90, Trial Tr., at 226:25–228:13; ECF No. 91, Trial Tr., at 64:6–65:19). The product numbering system was developed at TVM's offices in Erin, Ontario over a period of a couple months by Mike Boulding and other TVM employees, including Peter Lister and Mike Tipan. (ECF No. 89, Trial Tr., at 30:16–19; 34:23–25). Mr. Orologio testified at trial that when the new codes were adopted, he did not care what the specific numbers were. He simply wanted the errors to be eliminated. (ECF No. 91, Trial Tr., at 64:6–65:19).

The first digit of the product numbering system indicated the brand, the second described the product, the third indicated the number of layers of bubbles, and the fourth digit indicated whether the product was square edge, one tab, two tabs or a quick seam. The next two numbers indicated the width and length of the product. (ECF No. 89, Trial Tr., at 33:2–34:3).

### h. Covertech's Marketing Efforts

Covertech advertises its marks extensively by using the marks in its literature, brochures, technical data sheets, price sheets, and invoices. Covertech also advertises in magazines, goes to trade shows, and uses them on its website, www.rFOIL.com. (ECF No. 87, Trial Tr., at 67:8-14, 86:15-19, 68:9-14; ECF No. 88, Trial Tr., at 138:16 – 139:3, 159:17-24). Covertech was and is trying to sell its products in the same market and to the same customers as TVM. (ECF No. 87, Trial Tr., at 133:25–134:5). Covertech and TVM use the same channels to market their respective products. They market online, to distributors, and to wholesalers. (*Id.* at 134:5–7). Covertech's rFOIL products and the products sold by TVM are used for the same functions. (*Id.* at 134:8–12).Covertech uses the marks and product numbers on the product it sells. The marks are on the product labels. (*Id.* at 67:15–24; Exs. 13. 95, K). Covertech uses the marks and product numbers on price sheets and order forms. (ECF No. 97, Trial Tr., at 72:6–8).

Covertech has used the same part number, product descriptions and upgraded literature since 2005. (ECF No. 88, Trial Tr., at 36:2–13).

### i. Commercial Strength of Covertech's Marks

Covertech has sold "millions and millions of dollars' worth" of rFOIL branded product in the United States. (ECF No. 87, Trial Tr., at 73:23–74:1). Dan Higgins ("Higgins"), the owner of Willow Springs, S.R.A., LLC in Wittenberg, Wisconsin, testified that he was familiar with Covertech's rFOIL product line and the Covertech product numbers. (ECF No. 88, Trial Tr., at 93:11–15, 94:24–95:16). Willow Springs is a sales rep

agency and distributor of hydronic heating components to the HVAC and plumbing industries. (*Id.* at 93:16–19). Willow Springs has purchased rFOIL that was manufactured by Covertech. (*Id.* at 95:12–14). Higgins testified that he believed rFOIL products were quality products and that the source of material that he bought was important to him. (*Id.* at 96:12–14, 103:18–19).

Covertech's customers associate the rFOIL brand with Covertech. They also associate CONCRETE BARRIER, NT RADIANT BARRIER, ULTRA NT RADIANT BARRIER, CONCRETE UNDERPAD, and ULTRA CONCRETE UNDERPAD with Covertech. (*Id.* at 107:2–12). Covertech's customers refer to Covertech's rFOIL products by using the product number or the marks. (*Id.* at 108:13–109:1).

### j. The Exclusive Distribution Agreement

In or about 1998, Mike Boulding and Furio Orologio met to discuss forming a relationship between TVM and Covertech. TVM and Covertech entered into an agreement that they both referred to as the exclusive distribution agreement. Covertech agreed to manufacture on an exclusive basis for TVM in the United States and TVM agreed to sell and market Covertech's products on an exclusive basis in the United States. (ECF No. 87, Trial Tr., at 48:16–21; ECF No. 89, Trial Tr., at 12:3–9; ECF No. 1 at ¶ 2; ECF No. 35 at ¶ 2).

Both parties were aware of an exception to the exclusive distribution agreement in the United States relating to a company called Fi-Foil, which asked Covertech to sell reflective insulation directly to it. Covertech sold product to Fi-Foil and paid TVM a commission on all of its sales to Fi-Foil, even though TVM was not involved in the sales.

(ECF No. 87, Trial Tr., at 50:25–52:2, 144:12-19; ECF No. 89, Trial Tr., at 66:4:15, 67:24–68:1; ECF No. 90, Trial Tr., at 15:22–17:5; ECF No. 91, Trial Tr., at 10:13–19, 131:21–23).

Pursuant to the agreement, Covertech was responsible for manufacturing. (ECF No. 87, Trial Tr., at 48:18–49:10). TVM was responsible for all sales, marketing equipment, literature, brochures, and other marketing materials, tradeshows, orders, and setting up representatives. (ECF No. 88, Trial Tr., at 136:6–7; ECF No. 89, Trial Tr., at 26:23–27:2; ECF No. 90, Trial Tr., at 18:13–20; Ex. 113; ECF No. 88, Trial Tr., at 9:4–14).

Covertech did not interact with customers. (ECF No. 90, Trial Tr., at 11:11-16). The customers who did call Covertech were redirected to TVM. (*Id.*, at 232:16–22). Mr. Boulding directed Covertech to send all technical inquiries from customers to TVM's engineer and product manager. (*Id.*, at 10:3–11; 232:6–25; 245:10–21). Covertech expected TVM to sell, advertise and attend trade shows and to answer all technical and installation questions. (*Id.*, at 224:2–13). TVM was responsible for providing technical support to the customers, hiring engineers, and ensuring compliance with regulations in the market, such as the different fire codes. (ECF No. 90, Trial Tr., at 223:16–224:24, 230:25–231:8).

TVM was responsible for developing new marketing material, though much of what it produced was based on information, photographs, drawings and other material that was provided by Covertech. (ECF No. 89, Trial Tr., at 19:19–22, 20:5–9, 21:10–24, 22:21–24, 24:16–22, 45:24–46:3, 69:13–14, 214:16–24, 217:19–23, 247:16–25, 248:1–24, 248:1–249:17, 255:3–17; ECF No. 91, Trial Tr., at 28:19–29-9).

Generally, all of the marketing material and literature that TVM created required Covertech's approval. If Covertech did not approve the material, then TVM would

modify it. (ECF No. 89, Trial Tr., at 38:13–16, 39:4–19, 46:4–12, 71:23–72:8, 73:20–74:5, 78:15–79:2, 219:6–11; ECF No. 91, Trial Tr., at 42:19–43:4, 62:11–15, 63:17–20).

TVM's salespeople targeted the customers, made sales calls and gave presentations and product sessions. (ECF No. 88, Trial Tr., at 13:9–14). TVM also had discretion regarding whom they would sell a product to, and had discretion to refuse to sell a particular product to a particular customer. (ECF No. 90, Trial Tr., at 11:20–12:3).

Other than TVM's largest customer, Bay Industries ("Bay"), TVM has not disclosed the identity of its customers to Covertech. (*Id.* at 224:4–8, 245:10–21).

For a while, both parties benefited from the exclusive distribution agreement because Covertech had nobody else to take its product line to the U.S. marketplace, Covertech was giving up access to the U.S. marketplace and was giving up selling to anyone other than TVM. (ECF No. 87, Trial Tr., at 48:22–25, 49:28–25).

TVM was compensated by being the exclusive distributor of the product line and by getting Covertech's products at a very good price, which it would then mark up for sale in the United States. (ECF No. 87, Trial Tr., at 50:1–6; ECF No. 88, Trial Tr., at 11:22–12:6; ECF No. 88 136:17–20; ECF No. 90, Trial Tr., at 223:16–23, 224:25–225:10).

Under the agreement, TVM was to go to the United States market to determine what the competition was selling, educate itself in the product line, get pricing from distributors, and report back to Mr. Orologio. (ECF No. 91, Trial Tr., at 36:13–18).

For new markets and applications, TVM would identify the applicable codes and determine if certification of the product was required. It would convey that information to Covertech, who would develop a product to meet those codes and the product tested.

Once the product was approved, Covertech would send the test results to TVM to put the information in the product literature. (ECF No. 91, Trial Tr., at 122:10–123:16).

Pursuant to the agreement, TVM sold Covertech's rFOIL products, including ULTRA NT RADIANT BARRIER, NT RADIANT BARRIER, CONCRETE BARRIER FOIL, CONCRETE UNDERPAD, and ULTRA CONCRETE UNDERPAD. (ECF No. 87, Trial Tr., at 52:3–9). Under the exclusive distribution agreement, TVM was allowed to use Covertech's names in selling Covertech's products. (*Id.* at 57:6–9; 75:8–19). From 1998 until 2006, Covertech sold over $40 million of product to TVM. (Ex. 24; ECF No. 87, Trial Tr., at 137:8–20).

### k. Termination of the Exclusive Distribution Agreement

The parties agreed to terminate the exclusive distribution agreement in October 2007. (ECF No. 89, Trial Tr., at 99:18–22). Beginning in December 2006 TVM began purchasing reflective insulation from Reflectix in addition to buying from Covertech. (*Id.* at 90:8–91:15). At the time that the exclusivity arrangement was terminated, TVM was buying product from both Covertech and Reflectix. (*Id.* at 109:2–5). TVM purchased product from Reflectix as well as from Covertech from 2006 through 2009. (*Id.* at 137:14–18).

Covertech gave two reasons for the termination of the exclusive distribution agreement. First, Covertech stated that TVM was having difficulty paying its bills to Covertech. (ECF No. 90, Trial Tr., at 233:7–14). TVM was having difficulty paying its bills to Covertech. (ECF No. 90, at 233:7–14). TVM's payment terms were net60, which meant

that payment was due to Covertech 60 days after the product was shipped. (ECF No. 88, Trial Tr., at 219:23–220:6). TVM began to have a large amount of invoices outside of net60, totaling around $1.2 million. (ECF No. 88, Trial Tr., at 220:22–25). TVM did not pay Covertech any interest on these overdue invoices. (ECF No. 90, Trial Tr., at 27:20–23). Covertech and TVM took steps to reduce the outstanding balance, though the problem was not resolved entirely. (ECF No. 87, Trial Tr., at 56:24–57:5; ECF No. 88, Trial Tr., at 220:22–221:20).

Second, Covertech discovered that TVM had been buying product from another manufacturer, Reflectix, and selling it using Covertech's brand names and trademarks. (ECF No. 87, Trial Tr., at 54:14–24). Covertech discovered that TVM had been passing off another manufacturer's product as Covertech product from its customer, Willow Springs. Willow Springs had received product from TVM that was unlike product it had seen when given a tour of the Covertech manufacturing facility. When Willow Springs was unable to receive a straight answer from TVM, it inquired with Covertech. Covertech informed Willow Springs that they had not manufactured the product that had been sent to Willow Springs. (ECF No. 88, Trial Tr., at 98:13–99:19, 100:2–102:23; Ex. 75). Covertech also related another incident in which TVM's Kansas City warehouse had sent out another manufacturer's product without relabeling it. (ECF No. 88, Trial Tr., at 24:23–25:9).

Mr. Boulding conceded that the millions of dollars of product that TVM purchased from Reflectix in 2006 and 2007 was contrary to TVM's agreement with Covertech. (ECF No. 90, Trial Tr., at 24:12–25).

### l. Private label arrangement

After Covertech and TVM terminated the exclusive distribution agreement, the parties entered into a private label arrangement, under which Covertech manufactured product for TVM that TVM sold under the TVM brand. (ECF No. 90, Trial Tr., at 94:22–95:1). Mr. Boulding testified that TVM would buy Covertech product packed in a TVM bag, under a TVM label, and ship it to customers, and that TVM would no longer buy or represent in any way the rFOIL brand. (ECF No. 89, Trial Tr., at 94:24–95:1). Mr. Boulding also testified that TVM "had no right to the rFOIL brand name after the exclusive distribution agreement ended." (ECF No. 89, Trial Tr., at 110:15–19).

According to Covertech, it was not happy with the new arrangement, because it had worked hard with the rFOIL branding of the product and it was doing well in the U.S. marketplace. (ECF No. 87, Trial Tr., at 55:24–56:4). John Starr testified that Covertech went along with the arrangement because the company had its "hands tied" by TVM, which owed Covertech more than a million dollars. (*Id.* at 56:5–13). Despite the private label arrangement, TVM was still buying and selling some Covertech reflective insulation using Covertech's rFOIL brand. (ECF No. 90, Trial Tr., at 240:9–10). Mr. Orologio testified that Covertech did not allow TVM to private label Covertech's CONCRETE BARRIER or

CBF product, which was a patented Covertech product, but TVM could still market it and sell it as rFOIL. (*Id.* at 240:14–241:8).

Mr. Orologio also stated that Covertech made it clear that it had every intention to continue to promote rFOIL. (*Id.* at 238:10–17). Covertech essentially started its distribution from scratch by hiring salespeople, including Peter Clarke and Kelly Myers. Covertech also attended tradeshows and took on everything that TVM did when it first started selling rFOIL in the United States. (*Id.* at 238:18–20; ECF No. 88, Trial Tr., at 4:15–22).

Under the private label arrangement, TVM was allowed to use the Covertech brand names and code numbers, so long as it was for Covertech's material. (ECF No. 87, Trial Tr., at 57:10–12; ECF No. 90, Trial Tr., at 240:9–13). Due to the private label arrangement, the warranty on the private label products was a TVM warranty. (ECF No. 90, Trial Tr., at 236:21–24, 237:7–12).

Around the time that the private label agreement was instituted, the volume of purchases from Covertech by TVM declined significantly. Covertech sold only $10 million of reflective insulation to TVM from 2007 to 2010. (Ex. 24; ECF No. 87, Trial Tr., at 137:8–20).

TVM stopped buying product from Covertech in 2010 or early 2011. (ECF No. 89, Trial Tr., at 136:18–22). Covertech stopped selling product to TVM and TVM no longer purchased products from Covertech. (ECF No. 90, Trial Tr., at 175:8–12; ECF No. 91, Trial Tr., at 79:6–20).

Covertech learned that between 2006 and 2009, TVM purchased more than $2.2 million of reflective insulation products form Reflectix, and between 2009 and 2013, TVM

purchased nearly $8 million of reflective insulation products from Soprema. (ECF No. 90, Trial Tr., at 48:8–23, 51:8–54:13; Exs. 28, 29, 31–36).

Between 2006 and 2010 TVM told Covertech that TVM was not buying product from competitors. (ECF No. 87, Trial Tr., at 60:21–24).

TVM and Covertech are direct competitors in the marketplace today. (ECF No. 89, Trial Tr., at 202:2–4).

### m. TVM's Use of Covertech's Marks

Covertech has lost a lot of money because of TVM's actions, because, as John Starr testified, Covertech is now "competing against itself." (ECF No. 87, Trial Tr., at 88:17–89:4). TVM led customers to believe that it was the manufacturer of the rFOIL products. (ECF No. 88, Trial Tr., at 137:4 – 20). In some instances, TVM even specifically claimed to be the manufacturer. (ECF No. 90, Trial Tr., at 30:13–31:11; ECF No. 91, Trial Tr., at 238:14–245:5; ECF No. 88, Trial Tr., at 79:10– 80:17). Mr. Boulding also improperly told customers that he owned part of Covertech. (ECF No. 88, Trial Tr., at 97:5–13).

TVM also tried to pass off other manufacturers' products as Covertech's rFOIL products to other customers, such as BCI and Metal Building Supply. (ECF No. 88, Trial Tr., at 162:3–167:15). Covertech learned about TVM's improper use of Covertech's mark through the industry. (ECF No. 87, Trial Tr., at 92:8–19). Mr. Starr told Mr. Boulding several times to stop using Covertech's product names and product numbers. (ECF No. 87, Trial Tr., at 168:17–25, 177:25–178:7, 206:17–20).

As of Mary 1, 2013, TVM was selling products on the www.tvmbuildingproducts.com website using the rFOIL, CONCRETE BARRIER, CONCRETE UNDERPAD, and ULTRA CONCRETE UNDERPAD marks. (Exs. 99, 78). TVM improperly used Covertech's ULTRA NT RADIANT BARRIER mark from 2010 to 2013, despite being aware that Covertech had used the mark for its products long before then. (ECF No. 87, Trial Tr., at 105:24–106:6; Ex. 5).

Covertech introduced evidence at trial that TVM used Covertech's marks on TVM's website from 2009 through 2013. (ECF No. 87 at 93:5–94:20; Exs. 19, 67, 87, 93). Among the evidence introduced at trial of TVM's improper use of Covertech's rFOIL mark were Exhibits 67, 78, 96, 99, and 122 and the testimony related thereto. Among the evidence introduced at trial of TVM's improper use of Covertech's ULTRA NT RADIANT BARRIER mark were Exhibits 11, 17, 19, 69, 70, 72, 84, and 87 and the testimony related thereto. Among the evidence introduced at trial of TVM's improper use of Covertech's CONCRETE BARRIER mark were Exhibits 67, 69, 70, 78, 84, 87, 96, 99, 103, and 122 and the testimony related thereto. Among the evidence introduced at trial of TVM's improper use of Covertech's CONCRETE UNDERPAD and ULTRA CONCRETE UNDERPAD marks were Exhibits 67, 69, 70, 84, 87, 93, 96, and 103 and the testimony related thereto. Covertech did not give TVM permission to use the marks on other companies' products and Covertech did not receive any money from TVM's sales of those products. (*Id.* at 94:15–20).

TVM also improperly used Covertech's CBF (CONCRETE BARRIER), CONCRETE UNDERPAD, and ULTRA CONCRETE UNDERPAD marks and corresponding product

numbers in TVM's 2011 product catalog. (Ex. 70; ECF No. 87, Trial Tr., at 94:23–95:6). This same catalog also uses the 1800 and 4800 product numbers. TVM improperly used Covertech's marks and product numbers in other advertising and product literature. (*See* Exs. 5, 69, 70, 84, 102, 122. 14). TVM also improperly used Covertech's marks and product number in TVM's price lists. (ECF No. 87, Trial Tr., at 125:25–127:25; Ex. 103).

In addition, TVM improperly marketed its products with Covertech's marks on the www.tvmbuildingproducts.com and www.tvmi.com websites. (ECF No. 87, Trial Tr., at 128:16–25; ECF No. 91, Trial Tr., at 43:7–15; Exs. 17, Y).  From 2010 to the present, Covertech had no relationship with TVM and Covertech was not paid by TVM for its use of these marks. (ECF No. 87, Trial Tr., at 91:11–92:4). Covertech never gave permission to TVM to use Covertech's marks or Covertech's product numbers with product that was not manufactured by Covertech. (*Id.* at 57:13–16).

In about 2010, Covertech found out about TVM's purchases from Reflectix and Soprema from a deposition in the *Mueller* case, which involved warranty claims involving reflective insulation. (ECF No. 87, Trial Tr., at 59:20–60:8). If Covertech had known about those purchases earlier, it would have stopped its relationship with TVM sooner. (*Id.* at 60:11–20). Mr. Starr explained that the situation "wasn't right. I mean, we had put a lot of money, effort, and time into the rFOIL brand name. It was something that we owned, and they were substituting somebody else's product. So we were losing a tremendous amount of sales on our own brand names." (*Id.* at 61:10–17). Customers have been confused by TVM's use of Covertech's marks. Customers see the products on TVM's websites and when they call Covertech, Covertech has had to explain that it is not selling those

products. Customers ask why Covertech is allowing TVM to use its marks and Covertech has had to explain that it was not permitting them to use the marks. (ECF No. 87, Trial Tr., at 135:8–136:16). As an example, Mr. Starr identified a company called Crossroads that experienced such confusion. (*Id.*)

Mr. Orologio also testified that Covertech's customers were being confused by TVM's actions. He described it as a "battle" so that all of the customers understand that TVM is no longer buying Covertech product. (ECF No. 90, Trial Tr., at 242:16–243:12). Mr. Clarke testified to instances of actual confusion as well. The first involved a company in Long Island called Worldwide Plumbing, which called him. Worldwide Plumbing was trying to buy CONCRETE UNDERPAD and Mr. Clarke gave them a quote. The customer said it had a quote for the exact same product name and number from TVM that was less expensive. Mr. Clarke had to explain who TVM is and why that product from TVM is not manufactured by Covertech. (ECF No. 88, Trial Tr., at 38:5–39:17).

Mr. Clarke also discussed confusion caused by a distributor called Can-Cell that was using Covertech's product numbers to sell TVM's products because Mr. Boulding told Can-Cell it was allowed to do so. One of Covertech's customers, Home Hardware, would call Covertech and say that Home Hardware could get the exact same product from Can-Cell. Mr. Clarke would then need to explain that it was not Covertech's product, but a different product altogether. That confusion by Home Hardware was still ongoing at the time of trial. (*Id.* at 39:18–41:8).

Mr. Clarke has had to field phone calls and try to explain the situation to customers. Covertech also put out a press release about TVM's unauthorized use of the

marks and product numbers. Every time a customer is confused, Mr. Clarke sends the customer a copy of the press release. In his words, he uses the press release "all the time." (ECF No. 88, Trial Tr., at 43:13– 44:13; Ex. 123). The confusion is particularly problematic because of the historical relationship between TVM and Covertech, and because the industry used to buy Covertech's products from TVM. (ECF No. 87, Trial Tr., at 136:17–137:5).

When asked about whether other companies use Covertech's names and product numbers, Mr. Starr explained that if they are buying Covertech's product, they are authorized to use Covertech's product names and numbers. If they are not buying Covertech's product, Mr. Starr will act to stop the usage. (*Id.* at 169:5–11).

For example, Mr. Starr was asked about a company called Thermo that markets CONCRETE BARRIER foil and uses Covertech's product numbers. Mr. Starr explained that Thermo is a distributor of Covertech. (*Id.* at 179:23–180:3). Similarly, Mr. Starr discussed a Covertech distributor called Ecofoil, and how Covertech makes it known to the industry that if you want to buy Covertech's ULTRA NT RADIANT BARRIER product, you can go to Ecofoil to get it. (*Id.* at 174:24–125:6).

Mr. Starr and Mr. Clarke were asked about other examples of Covertech's mark being used on the internet. Mr. Starr and Mr. Clarke testified that, in the U.S., all of the uses were either by an authorized user (such as a Covertech distributor), or were unauthorized uses by TVM or one of TVM's distributors or suppliers. (*Id.* at 218:13–17; ECF No. 88, Trial Tr., at 46:18–49:5). Mr. Boulding testified that the www.tvmbuildingsproducts.com website, which improperly marked TVM products with

Covertech's marks, is administered by one of TVM's distributors who buys from TVM and sells to the online customers. (ECF No. 89, Trial Tr., at 111:2–20). Mr. Boulding also stated that TVM had reached an agreement with the distributor to have it handle the commerce site for TVM. (*Id.* at 114:1–4).

Mr. Boulding stated that the tvmbuildinproducts.com website is one of the ways that TVM promotes its products. (ECF No. 90, Trial Tr., at 34:23–25). On that website are TVM's name, logo, mission statement, and a section about TVM Building Products. (*Id.* at 35:9–24; Ex. 131). TVM's corporate website, www.tvmi.com, contains a link to the www.tvmbuildingproducts.com website. (*Id.* at 36:10–37:1; Ex. 73).

Mr. Boulding also stated that he could call up the distributor, Michael Thrift, and have him change content on the site and remove references to rFOIL, which Mr. Boulding actually did during the trial. (ECF No. 89, Trial Tr., at 114:6–12; ECF No. 90, Trial Tr., at 32:21–34:16). Mr. Boulding says that he speaks to Mr. Thrift every day. (ECF No. 90, Trial Tr., at 34:7).

Mr. Boulding paid an employee of Mr. Thrift to run some searches for use at trial. (ECF No. 90, Trial Tr., at 38:16–39:10). In other words, Mr. Boulding paid an employee of Michael Thrift to search for instances where third parties were using Covertech's marks. The selective results did not include the use of the marks on www.tvmbuildingproducts.com. (ECF No. 90, Trial Tr., at 38:23–39:10). Exhibit 24 shows the amount of product TVM purchased from Covertech from 1998 until 2010, broken down by year. (Ex. 24; ECF No. 87, Trial Tr., at 137:8–20).

Exhibit 25 shows TVM's sales to its customers in the metal building industry. (ECF No. 89, Trial Tr., at 202:25–206:2). TVM's sales from 2009 to 2013 total $5,791,92. (Ex. 25). Exhibit 26 shows TVM's sales of the 1800 ULTRA NT RADIANT BARRIER from 2006 through 2013. (Ex. 26; ECF No. 90, Trial Tr., at 44:18–45:3). TVM's sales of ULTRA NT RADIANT BARRIER between 2010 and 2013 total $369,014. (Ex. 26).

### n. TVM's Registration of the ULTRA NT RADIANT BARRIER Trademark

A few months after Covertech registered ULTRA NT RADIANT BARRIER as its trademark in Canada, TVM filed an application with the USPTO to register ULTRA NT RADIANT BARRIER as a trademark in the United States. (Exs. 4, 11). The registration was done by and for TVM, not Covertech. (Ex. 11; ECF No. 87, Trial Tr., at 114:25–115:5).

In connection with the application, TVM submitted a Response to Office Action on September 9, 2011, stating that:

> The applicant is using the mark in commerce, or the applicant's related company or licensee is using the mark in commerce, on or in connection with the identified goods and/or services. 15 U.S.C. Section 1051(a) as amended. The mark was first used at least as early as 06/01/2006 and first used in commerce at least as early as 06/01/2006, and is now in use in such commerce.

(Ex. 11, Response to Office Action dated 9/9/2011). TVM also submitted a declaration that was electronically signed by Mr. Boulding on September 9, 2011, in which he stated that "[t]he undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements may jeopardize the validity of the application or any resulting registration." (Ex. 11; ECF No. 89, Trial Tr., at 126:7–9; ECF No. 90, Trial Tr., at

59:11 – 60:13; ECF No. 87, Trial Tr., at 118:6-16). Mr. Boulding stated that it was TVM's "understanding that Covertech had abandoned the mark." (ECF No. 90, Trial Tr., at 62:10–25).

Mr. Boulding conceded that the evidence at trial showed that Covertech is using ULTRA NT RADIANT BARRIER today and has been using it continuously since 2003. (ECF No. 90, Trial Tr., at 63:1–16). Mr. Boulding admitted at trial "that the statement that [he] signed under penalty of perjury in the USPTO is now false." (ECF No. 90, Trial Tr., at 66:15–18). He also conceded that he has not submitted an amendment. (*Id.* at 66:19–21).

Pursuant to the application filed by TVM on March 30, 2011, the USPTO added the trademark ULTRA NT RADIANT BARRIER to its principal register on January 17, 2012 as Reg. No. 4,086,776. (Ex. 114, ¶ 6; Ex. 12).

Covertech filed its own application to register the ULTRA NT RADIANT BARRIER mark, but the registration has not been approved because TVM had already registered the mark. (Ex. 132; ECF No. 87, Trial Tr., at 165:20–23). In connection with the application, Mr. Starr submitted a declaration in which he stated that he believed that Covertech was the owner of the mark and that Mr. Starr believed that no other entity had the right to use the mark. (Ex. EEEE).

The USPTO has placed Covertech's application in suspense pending the termination of this civil action. (Ex. 132).

### o. TVM's Failure to Pay Covertech Invoices

TVM was often behind in the payment of invoices to Covertech for product that Covertech had shipped to TVM. Covertech was required to take steps to remedy the situation. (ECF No. 87, Trial Tr., at 56:24–57:5; ECF No. 88, Trial Tr., at 220:22–221:20). Mr. Szymanowski, Covertech's comptroller, testified at trial that TVM owed Covertech $228,305.17 for the unpaid invoiced. (ECF No. 88, Trial Tr., at 231:1–9; Ex. 40). Mr. Boulding admitted at trial that TVM had not paid Covertech for these invoices. (ECF No. 89, Trial Tr., at 221:7–16).

### p. TVM's Credit Requests

Mr. Boulding testified at trial that TVM did not pay Covertech for the invoices listed on Exhibit 40 because there were credits due to TVM for warranty claims that had been approved by Covertech but not paid. He believed that the money TVM owed to Covertech was offset by money that Covertech owed to TVM. (ECF No. 89, Trial Tr., at 221:7–25). Mr. Boulding testified that all of these credit requests had been approved by Covertech. (ECF No. 89, Trial Tr., at 221:17–21). TVM introduced no other supporting evidence on this point. On cross-examination, also Mr. Boulding conceded that some of the credit requests he identified had already been paid by Covertech. (ECF No. 90, Trial Tr., at 90:25–92:7).

### q. TVM's Failure to Pay Settlement Agreements Regarding Warranty Claims

In October 2010 and thereafter, TVM agreed to pay a portion of the settlements to resolve warranty claims for allegedly defective insulation submitted by Southern

Structures, LLC ("Southern Structures"), Acadian Commercial, LLC ("Acadian"), Halpin's Flooring America ("Halpin's"), Marquis Building ("Marquis"), and Dayon. (ECF No. 1 at ¶¶ 63, 127; ECF No. 35 at ¶¶ 63, 127; Exs. 21–23).

Mr. Szymanowski testified that for Southern Structures, Acadian, Halpin's, and Marquis, TVM agreed to pay a portion of those settlements, Covertech then paid the settlements to the claimants and obtained releases, but TVM has not paid its agreed upon contribution to (ECF No. 88, Trial Tr., at 231:10–240:2).

Mr. Szymanowski also testified about Exhibits 21, 22, and 23, which show that TVM agreed to pay a portion of those settlements; that Covertech then paid the settlements to the claimants and obtained releases; and that Covertech invoiced TVM for its portion of the settlement. (*Id.* at 235:2–240:2; Exs. 21-23).

Mr. Szymanowski further testified at trial that TVM had not paid its agreed upon contribution to Covertech. (ECF No. 88, Trial Tr., at 231:10–240:2). The total amount that TVM agreed to contribute to these settlements was $13,000. (Exs. 21 – 23; ECF No. 88, Trial Tr., at 235:2 – 239:8). TVM has not paid that money to Covertech. (ECF No. 88, Trial Tr., at 236:7–1; 238:17–18; 240:1–2). Mr. Boulding testified that while TVM had not paid Covertech for the Southern Structures, Acadian, Halpin's, and Marquis claims, TVM had instead paid an entire claim for $15,000, though he did not remember whom that claim was paid to. (ECF No. 89, Trial Tr., at 220:10–11, 220:11–13). He testified that the $15,000 payment offset the $13,000 that TVM had agreed to pay. (*Id.* at 220:23–221:3). TVM provided no further evidence in support of that assertion.

### r.  TVM's Counterclaim for Fraud

At some point in the 1990s, Covertech's rFOIL product started to be used in the metal building industry. At some point, Covertech started to manufacture product with Fire Retardant ("FR") in it, and the product could be used in metal buildings. (ECF No. 91, Trial Tr., at 52:15–22).

In 2004, TVM and Covertech received first reports of problems with rFOIL. The reports stated that rFOIL was degrading in certain applications. In 2004, there were at least three reports of the product degrading when used in the roof of an open-sided building or porch.  The product was becoming brittle and falling apart. (ECF No. 89, Trial Tr., at 141:22 – 142:10, 144:7 – 145:17; ECF No. 91 at 9:7 – 16).

According to Mr. Orologio, both TVM and Covertech knew in 2004 that the cause of the degradation could be UV. Mr. Orologio testified that there was a meeting in the spring or summer of 2004 with Mr. Boulding, Mike Dubreuil of Ampacet, the company that had provided the resin used by Covertech to make its polyethylene film, and himself. According to Mr. Orologio, they were told by Mr. Dubreuil that the cause of the degradation was exposure to UV light. Mr. Orologio testified that Mr. Boulding was skeptical of the conclusion. Mr. Orologio believed that Mr. Boulding would take steps to ensure that no one would apply the product under those conditions. (ECF No. 91, Trial Tr., at 10:5 – 13:20, 14:20 – 15:11, 81:16 – 82:25).

Prior to the 2004 meeting with Mr. Dubreuil at Ampacet, Mr. Orologio did not know that the reflective insulation would degrade where it did not make direct contact with UV rays. (*Id.* at 22:20–23). Prior to 2004, Mr. Orologio also did not know that sunlight

coming through small windows would degrade the product, and he did not believe that UV bouncing off concrete would degrade product on the ceiling. (*Id.* at 22:24–23:30).

Mr. Orologio was asked why he, as the manufacturer, did not stop selling the product to TVM and he explained that the product was being used for multiple purposes. It could be used behind drywall, in attic applications, and under concrete. The same product was used for multiple purposes. (ECF No. 91, Trial Tr., at 15:20–16-16, 108:1–9; Ex. B).

TVM learned in 2004 that a UV additive could be included in the product, but did not request that it be included in the product. (ECF No. 90, Trial Tr., at 78:8–79:1; ECF No. 91, Trial Tr., at 148:6–14). Mr. Orologio testified that he told Mr. Boulding to make sure his customers did not use it for application where it would be subject to direct or indirect UV light. (ECF No. 91, Trial Tr., at 131:10 – 18). Mr. Boulding stated that he knew that UV could cause white poly to degrade in 2005. (ECF No. 90, Trial Tr., at 67:10–14).

Mr. Orologio was very upset when he learned there were more claims and he questioned Mr. Boulding about what had been done to prevent it from happening again. In 2004, Mr. Orologio had encouraged TVM to communicate the issue to its customers. (ECF No. 91, Trial Tr., at 18:10–24).

Mr. Orologio met with Mr. Boulding on September 28, 2005, and demanded that Mr. Boulding inform the marketplace that the product could not be used where it was going to be exposed to UV light. Mr. Boulding prepared and sent out an Urgent Notice regarding degradation. (ECF No. 91, Trial Tr., at 19:1–4; Ex. NN2).

The Urgent Notice was titled Urgent Notice – Open Sided Building and it stated "Please be advised that TVM no longer recommends WHITE POLY-FACED rFOIL products, for use in open-sided buildings, overhangs, lean-to structures, or anywhere the while poly may be exposed to direct or reflected UV light." The Urgent Notice also states that "This problem is not unique to rFOIL. Any polyethylene product can degrade when exposed to UV radiation." (Ex. NN2). According to Mr. Orologio, his discussion with Mr. Boulding was not limited to open-sided buildings. (ECF No. 91, Trial Tr., 19:5–24).

According to Mr. Boulding, he thought the Urgent Notice had its intended effect because, to his recollection, there were no claims in 2006. (ECF No. 89, Trial Tr., 170:7–171:2). According to Mr. Boulding, TVM learned in December 2007 that the degradation was a bigger problem because they started to see the problem in enclosed buildings, i.e., metal buildings with walls, bay doors and skylights, for the first time. That was when the "light bulb" went off. (*Id.* at 118:1– 21; ECF No. 90, Trial Tr., at 83:9–20; ECF No. 91, Trial Tr., at 187:23– 188:3; Ex. UU).

Mr. Boulding said that TVM had no record of UV damage in enclosed buildings, with walls and skylights, prior to 2007. (ECF No. 90, Trial Tr., at 85:2– 86:15). However, at trial it was established that, contrary to Mr. Boulding's recollection and testimony, TVM had notice of at least two claims in 2006 that involved UV degradation in enclosed buildings. (*Id.* at 86:16–87:16, 87:25–88:4; ECF No. 91, at 142:1–143:3, 190:11–191:18; Ex. 134, 138).

Mr. Orologio stated that in 2006, he and Mr. Boulding discussed that the product could degrade if it was exposed to direct or indirect light, whether it was enclosed or

exposed to the elements. (ECF No. 91, Trial Tr., at 21:14–21). Prior to 2007, Mr. Boulding knew that there had not been any UV testing done on the insulation. (ECF No. 90, Trial Tr., at 77:12–78:7). Covertech met the requirements of many other tests, such as fire code, emissivity codes, reflectivity codes, strength, tensile, puncture, resistance, corrosion, moisture barrier test, and the fungi test, all of which were requested by TVM. TVM never requested testing for UV. (ECF No. 91, Trial Tr., at 123:17–124:10; Ex. JJJJ).

Consistent with TVM's notice of claims of UV degradation in enclosed buildings with windows and skylights in 2006, in January 2007, Balkar Jagpal at TVM sent one of its distributors, Mueller, a letter stating that rFOIL reflective insulation "that was installed in areas exposed to UV light" that resulted in "delamination and flaking of the white surface. . . . [TVM] recommend[s] against the use of our products in any such environment." (ECF No. 90, Trial Tr., at 90:1–24; Ex. 135). Later in December, 2007, TVM had a managers' meeting and they decided to put UV inhibitor in all products going forward. (ECF No. 89, Trial Tr., at 181:1–183:10).

TVM requested the price of adding UV inhibitor by email, and Mr. Orologio provided that information by telephone. (ECF No. 91, Trial Tr., at 23:21–25:4). According to Mr. Boulding, UV inhibitor was then added to the product, but the price of the product did not increase. (ECF No. 89, Trial Tr., at 185:19–25; ECF No. 90, Trial Tr., at 190:3–191:6). Covertech started to add UV inhibitor to its product in late 2006 or 2007. Mr. Orologio stated that he added the inhibitor, but did not tell the industry until 2008 because he did not have the weathering test results from Ampacet. He did not have the results and he did not want to make claims that he could not back up. (ECF No. 91, Trial Tr., at 148:23–150:7,

151:16–152:11, 155:8–156:7, 158:24–159:25, 165:25–166:15, 169:10–23; Ex. AAA (Ampacet weathering test); Ex. GGG-1 (2006 test from Ampacet)). There have been no degradation claims of product containing the UV inhibitor. (ECF No. 89, Trial Tr., at 186:1–15)).

At the trial in the matter, Mr. Orologio explained that he had known that UV inhibitors being used in solar blankets (pool covers) for decades and that it in certain areas, they are required or the blanket will degrade. He testified that if a solar blanket were used in Arizona, it would require a UV package, but if it were used in Toronto, Canada, where there is less direct sunlight, the UV package would not mean that much. Mr. Orologio said that this was common knowledge in the pool cover business, a line of products Covertech also sells. (ECF No. 91, Trial Tr., at 5:24–6:3).

In explaining his statement during the *Mueller* deposition, Mr. Orologio testified at the trial in this case that, being in the swimming pool business, he knew that if polyethylene was exposed to sunlight, it would deteriorate. Prior to 2004, he believed the product probably would not deteriorate in applications where it was applied to the ceiling with minimal exposure to sunlight. (ECF No. 91, Trial Tr., at 97:14–98:24). Mr. Orologio stated that he knew that the product was being used in metal buildings, but the metal buildings that he saw every day, so-called Quonset buildings, had no windows, no skylights and only a door at the end. He did not know, in April of 2006, that Mueller's buildings contained skylights and windows. (*Id.* at 109:22–110:16, 115:21–116-10).

According to Mr. Boulding, "we anticipate that we lost about $12 and a half million in sales due to the defective product." Tr., Boulding, 10/22 at 206:24-25. According to Mr. Boulding, for that $12 and half million in sales, TVM's profit margin is

approximately 30 percent, so about $4 million, a little over $4 million." (ECF No. 89, Trial Tr., at 207:1–5). Mr. Boulding agreed that he had testified that his margin was 15 to 30 percent and that he just picked the highest number. He said he "did not go through every sale." (ECF No. 90, Trial Tr., at 110:1–12). Mr. Boulding did not discount for the fact that at this same time, TVM stopped selling rFOIL and started to compete against it. He agreed that for eight years, rFOIL had been "the world's leading reflective insulation." He also said that it was the "leading reflective insulation brand worldwide." (*Id.* at 110:21–111:23). Mr. Boulding did not account for other situations that were unrelated to Covertech, such as customers complaining about Kelly Myers. (*Id.* at 115:22–116:8). Mr. Boulding did not provide written support for his calculations.

In the *Mueller* case, TVM and Covertech entered into a settlement agreement on July 25, 2013. (Ex. 52). As stated in the recitals to the settlement agreement, "the Parties have agreed to fully and finally compromise, settle and resolve all claims, potential claims, causes of action and potential causes of action asserted by them in the above entitled and numbered cause . . . ." (Ex. 52).

The settlement agreement, includes a release, which states that:

> TVM [and its affiliates], hereby forever release, acquit, and discharge
> Covertech and [its affiliates] of and from any and all claims and
> actions or causes of action asserted in the above-entitled and
> numbered cause, **together with any and all claims and causes of
> action, including but not limited to claims for** indemnity,
> contribution, breach of express and implied warranties, breach of
> contract, negligence, any tort claims, negligence based claims, ***fraud
> and/or misrepresentation based claims***, all claims arising out of any
> past, present or future breach of express and/or implied warranty,
> statutory and/or common law indemnity claims, claims for any and
> all actual and/or exemplary and/or punitive damages, claims for

> equitable relief arising out of the sale, delivery, repair, replacement of any insulation products and/or services sold to or provided to Mueller, Inc."

(Ex. 52, § 3.1 (emphasis added); ECF No. 90, Trial Tr., at 119:10–121:13). According to Mr. Boulding, he is not seeking damages for anything arising from the products in the Mueller case. He said that Mueller accounted for approximately 20 percent of the amount of TVM's sales in that period of time. (*Id.* at 156:25–157:16).

## V.  CONCLUSIONS OF LAW

Covertech has brought claims against TVM under the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), including trademark infringement claims relating to its registered rFOIL and CONCRETE BARRIER trademarks, as well as unfair competition claims relating to its unregistered CONCRETE UNDERPAD/ULTRA CONCRETE UNDERPAD and ULTRA NT RADIANT BARRIER marks. (ECF No. 1 at 20–23). Covertech has also brought a claim that TVM committed fraud on the USPTO by registering the ULTRA NT RADIANT BARRIER mark. (*Id.* at 24–25). Covertech further asserts claims for common law unfair competition, two distinct claims for breaches of contract, and a claim for unjust enrichment. (*Id.* at 23–30). The Court notes that the parties have stipulated to the voluntary dismissal of Covertech's claims for federal trademark dilution and fraudulent misrepresentation. (ECF No. 93).

### a.  Federal Trademark Infringement – rFOIL

A person shall be liable in a civil action by the registrant of a trademark if he, without the consent of the registrant, does the following:

> (a) use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
>
> (b) reproduce[s], counterfeit[s], cop[ies], or colorably imitate[s] a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . .

15 U.S.C. § 1114(1).

To prove a violation of the Lanham Act through trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), "a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) (citing *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency,* Inc., 214 F.3d 432, 437 (3d Cir.2000)). The plaintiff bears the burden of proof. *Id.* at 211 (citing *American Home Prods. Corp. v. Barr Labs., Inc.*, 834 F.2d 368, 371 (3d Cir.1987)).

The Court found above that the United States Patent and Trademark Office ("USPTO") added the trademark rFOIL to its principal register pursuant to an application filed by Covertech on September 18, 1997. If the mark at issue is federally registered and has become incontestable, then validity, legal protectability, and ownership are proved. *See Commerce Nat. Ins. Servs., Inc.*, 214 F.3d at 438 (citing *Ford Motor Co. v. Summit Motor Prods.*, 930 F.2d 277, 292 (3d Cir.1991)). The parties stipulated prior to trial that rFOIL was

incontestable pursuant to 15 U.S.C. § 1065. (ECF No. 79 at 1). Thus, Covertech has succeeded in proving ownership, legal protectability and validity of rFOIL. *See Ford Motor Co.*, 930 F.2d at 292.

### i. Likelihood of Confusion

Next, the Court must determine whether or not Covertech has demonstrated likelihood of confusion. Likelihood of confusion exists where the consumers viewing the defendant's mark would probably assume that the product or service it represents associated with the source of a different product or service is identified by a similar mark. *Ford Motor Co.*, 930 F.2d at 292 (quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978)). The Third Circuit has identified a number of factors that govern the likelihood of confusion analysis, namely:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to expand into the defendant's market.

*Id.* at 293 (citing *Scott Paper Co.*, 589 F.2d at 1229). The plaintiff must show likely confusion by a preponderance of the evidence. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 120 (2004). The ten factors of the analysis will each be considered individually below.

### 1. Factor One: Degree of Similarity

Perhaps the most important of the factors on the above ten-factor list is the degree of similarity between the two marks. *Ford Motor Co.,* 930 F.2d at 293. The Third Circuit has held that "if the overall impression created by marks is essentially the same, 'it is very probable that the marks are confusingly similar.'" *Id.* (citing *Opticians Ass'n of America v. Independent Opticians of America,* 920 F.2d 187, 195 (3d Cir. 1990)). The likelihood of confusion should be determined by viewing the two marks from the perspective of an ordinary consumer of the goods or services. *See id.* (citing *Dominion Bankshares Corp. v. Devon Holding Co., Inc.,* 690 F.Supp. 338, 345 (E.D.Pa. 1988); 2 McCarthy, *Trademarks and Unfair Competition* at §§ 23:27–29). The degree of caution used by these ordinary consumers depends on the relevant buying class. *Id.* Where a buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class. *Id.*

The Court finds that the evidence presented at trial establishes that TVM used the identical rFOIL mark as Covertech. Covertech asserted at trial that TVM had tried to pass off other manufacturers' products as Covertech's rFOIL products to other customers, such as BCI and Metal Building Supply. (ECF No. 88, Trial Tr., at 162:3–167:15). Covertech further testified that it had learned about TVM's improper use of Covertech's marks through the industry. (ECF No. 97, Trial Tr., at 92:8–19).

Of particular importance is the listing of "ULTRA CBF CONCRETE BARRIER rFOIL" on the www.tvmbuildingproducts.com website. (Exs. 67, 96, 99). TVM counters that it does not control this website as it is the website of a TVM distributor. (ECF No. 96

at 20). Upon learning of the advertisement at trial, TVM contacted the distributor to remove all references to rFOIL. (*Id.*).

By TVM's own admission, it has influence over what is put on that website. Mr. Boulding testified that he could call up the distributor, Michael Thrift, and have him change the content on the site and remove the references to rFOIL. (ECF No. 89, Trial Tr., at 114:6–12; ECF No. 90, Trial Tr., at 32:21–34:16). There is a link from the TVM website to TVM distributors and TVM online retailers, including links to www.tvmbuildingproducts.com and www.tvmbuildingproducts.ca. (Ex. 73). In addition, the www.tvmbuildingproducts.com website explains that TVM Building Products began as a distributor, but slowly developed their own line of building materials under the TVM name. (Ex. 130). The website further states that "TVM Building Products are proudly distributed by www.tvmbuildingproducts.com." (*Id.*).

The Court finds it noteworthy that it was not until trial that TVM asked the website's administrator to take down the references to rFOIL. (ECF No. 96 at 20). TVM presented no evidence that it had asked the website administrator to take down rFOIL references in the past. This evidence supports a finding of mark similarity.

Further, Covertech presented evidence of the similarity of the TVM products in the form of testimony by Dan Higgins of Willow Springs. (ECF No. 88, Trial Tr., at 98:13–99:19, 100:2–102:23; Ex. 75). Mr. Higgins testified that he had received product from TVM in 2007 with the Covertech rFOIL label on it. (*Id.* at 98:12–13). He later learned that the product was not from Covertech. (*Id.* at 98:15–17). Mr. Higgins testified that he had shipped three rolls of the product up to Covertech for inspection, which determined that

the product he had been sent was not Covertech product. (*Id.* at 102:12–19). The Court has found Mr. Higgins to be a credible witness. His representation to the Court that he received product from TVM that was allegedly rFOIL product but was not manufactured by Covertech is strong evidence of the fact that TVM was passing off non-Covertech product under the rFOIL mark.

The Court finds that there is sufficient evidence that TVM used a mark identical to Covertech's rFOIL mark, and that it tried to pass off another manufacturer's rFOIL mark as Covertech's rFOIL mark. This factor therefore favors Covertech.

## 2. Factor Two: The Strength of the Owner's Mark

The second factor in the analysis is the strength of the owner's mark. *A & H Sportswear, Inc.*, 237 F.3d at 211. In making this determination, the Court must examine: (1) the mark's distinctiveness or conceptual strength (the inherent features of the mark) and (2) its commercial strength (factual evidence of marketplace recognition). *Freedom Card, Inc. v. JP Morgan Chase & Co.*, 432 F.3d 463, 472 (3d Cir. 2005). The conceptual strength of a mark is determined by classifying the mark in one of four categories: (1) generic (such as "DIET CHOCOLATE FUDGE SODA"); (2) descriptive (such as "SECURITY CENTER"); (3) suggestive (such as "COPPERTONE"); and (4) arbitrary or fanciful (such as "KODAK"). *A & H Sportswear, Inc.*, 237 F.3d at 221.

> Arbitrary or fanciful marks use terms that neither describe nor suggest anything about the product; they bear no logical or suggestive relation to the actual characteristics of the goods. Suggestive marks require consumer imagination, thought, or perception to determine what the product is. Descriptive terms forthwith convey[ ] an immediate idea of the ingredients, qualities or characteristics of the goods. Generic marks are those that "function as the common descriptive name of a product class. In order to

> qualify for Lanham Act protection, a mark must either be suggestive, arbitrary, or fanciful, or must be descriptive with a demonstration of secondary meaning. Generic marks receive no protection; indeed, they are not "trademarks" at all.

*Id.* at 221–222 (internal citations and quotations omitted). The Lanham Act provides that stronger marks receive greater protection. *Id.* at 222. The particular level of distinctiveness into which a mark falls (i.e., arbitrary, suggestive, or descriptive) is not the only measure of conceptual strength. *See id.* The classification system's primary purpose is to determine whether the mark is protectable as a trademark in the first place, that is, to determine whether consumers are likely to perceive the mark as a signifier of origin, rather than as a mere identification of the type of product. *Id.* (citing *A.J. Canfield Co. v. Honickman*, 808 F.2d 291 (3d Cir. 1986); *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 489 (2d Cir. 1988)).

The Court finds that the mark rFOIL is not arbitrary or fanciful, as the word "foil" included in "rFOIL" suggests something about the characteristic of the product. Suggestive marks require consumer imagination, thought, or perception to determine what the product is. *Id.* Covertech produces reflective insulation. The word "foil" in rFOIL suggests that the product has reflective qualities. Thus, the Court finds that rFOIL should be classified as a suggestive mark, thereby qualifying for Lanham Act protection.

With regard to commercial strength, the Court must examine marketplace recognition. *Freedom Card,* 432 F.3d at 472. The parties agree that the rFOIL mark has been in existence since 1998 or 1999. (ECF No. 87, Trial Tr., at 53:10–24; Ex. 1; ECF No. 96 at 3). Covertech came up with the name rFOIL, which it developed with a marketing company

prior to working with TVM. Covertech also states that TVM had no role in coming up with the rFOIL name. (ECF No. 87, Trial Tr., at 61:22–62:7).

At trial, Covertech introduced numerous Exhibits of marketing material that referenced rFOIL. (*See* Exs. 6, 9, 10, 18, 66, 68). The Court finds that Covertech has provided sufficient evidence of extensive marketing material to warrant a finding that the rFOIL mark is commercially strong. The Court finds that Covertech's rFOIL mark has achieved marketplace recognition based on its extensive marketing material. Covertech further represented to the Court that it has sold "millions and millions of dollars' worth" of rFOIL-branded product in the United States. (ECF No. 87, Trial Tr., at 73:23–74:1). Covertech also presented evidence in the form of testimony by Dan Higgins that its customers are familiar with the rFOIL product line, that they believe it is quality product and they associate it with Covertech. (ECF No. 88, Trial Tr., at 96:12–14, 107:2–12). The Court finds Covertech's employees and customers to be credible in all these areas. Thus, the Court finds that the mark is a strong one because it has achieved extensive sales of its product and it is well-known by consumers in the reflective insulation market.

### 3. Factor Three: The Price of the Goods

The third factor considers "the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase." *A & H Sportswear, Inc.*, 237 F.3d at 211. Evidence at trial suggested that TVM and Covertech customers exercised care when choosing their product. Mr. Higgins testified that the source of the material he buys is important to him. (ECF No. 88, Trial Tr., at 103:18–19). He also testified that he believed the rFOIL products were quality products. (*Id.* at 96:12–

14). According to Mr. Starr, a typical roll of Covertech's rFOIL products costs $70 to $120. (ECF No. 87, Trial Tr., at 47:1–11). Covertech only sells its product by the truckload, each of which costs $20,000 to $30,000. (*Id.*). The Court finds evidence of sophistication among distributors such as Dan Higgins of Willow Springs. However, the Court notes that even Mr. Higgins testified to being confused about the origin of the product he received from TVM, which was dissimilar from the product he had seen during his visit to the Covertech factory. (ECF No. 88, Trial Tr., at 98:13– 99:19, 100:2– 102:23; Ex. 75). The Court notes that Mr. Higgins is merely a distributor in the supply chain, and that no evidence was presented at trial regarding the level of sophistication among the ultimate consumers of Covertech product.

### 4. Factor Four: Length of Use without Evidence of Actual Confusion Arising

The fourth factor considers "the length of time defendant has used the mark without evidence of actual confusion arising." *A & H Sportswear, Inc.*, 237 F.3d at 211. Covertech provided evidence at trial that Mr. Higgins of Willow Springs was confused upon receiving product that was purportedly manufactured by Covertech but did not bear a resemblance to the Covertech product he had seen at the factory. (ECF No. 88, Trial Tr., at 98:13–99:19, 100:2–102:23; Ex. 75). Mr. Higgins further related that he was unable to get straight answers about the product from TVM, and that after the product was sent to Covertech for inspection, Covertech confirmed that it was not its product. (*Id.* at 100:20– 201:23). In relating this incident, Covertech has conveyed one instance in which there was confusion in the marketplace because of the similarity between rFOIL product

manufactured by Covertech and rFOIL product manufactured by another manufacturer and passed off as Covertech product by TVM. The Willow Springs incident occurred in 2007. (*Id.* at 103:4).

TVM argues that Mr. Higgins' statements are clearly skewed because Mr. Higgins stated that there was also a red and white Covertech label attached to the product, and neither Covertech, nor TVM has ever used a red and white label. (ECF No. 96 at 69). The Court finds that Mr. Higgins' mere misrecollection of the color of the label attached to the product he purchased from TVM does not undermine the validity of his statements regarding the provenance of the product he ordered or his subsequent interactions with TVM and Covertech. The Court finds Mr. Higgins' testimony to be credible, and that it provided strong evidence that confusion arose in the marketplace shortly after TVM began to use Covertech's mark. This factor favors Covertech.

### 5.  Factor Five: Defendant's Intent

The fifth factor is the "intent of the defendant in adopting the mark." *A & H Sportswear, Inc.*, 237 F.3d at 211. Covertech claims that TVM has willfully adopted its rFOIL and other marks with an intent to exploit them for TVM's own improper pecuniary gain. (ECF No. 97 at 60). TVM served as Covertech's marketing arm and was therefore well aware of Covertech's use of the rFOIL mark. The Court found above that Covertech presented sufficient evidence that TVM had copied its product, and that Covertech never expressed an intent to abandon its rFOIL mark. Therefore, the Court concludes that TVM's adoption of the rFOIL mark was intentional and willful. *See Kos Pharmaceuticals*, 369 F.3d at 721.

### 6. Factor Six: Evidence of Actual Confusion

Covertech presented instances of actual confusion at trial. As the Court noted above, Dan Higgins of Willow Springs testified to his confusion regarding the rFOIL product line when he received product from TVM that was purportedly manufactured by Covertech but did not bear any of the characteristics of the product he had seen while touring the Covertech facility. (ECF No. 88, Trial Tr., at 98:13–99:19, 100:2–102:23). The Court finds that this factor favors Covertech.

### 7. Factor Seven: Marketing and Advertising of Material

In addition, Covertech established at trial that it advertises through the same channels of trade as TVM, namely on the internet, at trade-shows, in trade magazines, and in promotional materials provided to customers. Covertech presented extensive evidence of its rFOIL marketing material at trial. (*See* Exs. 6, 9, 10, 18, 66, 68). Both Covertech and TVM use their websites to promote their product. Finally, they both have advertised in Rural Builder magazine. (Exs. 6, I, J). The Court is satisfied that Covertech advertised through the same channels of trade as TVM. This factor of the analysis thus also favors Covertech.

### 8. Factor Eight: Targets of the Parties' Sales Efforts

The eighth factor of the analysis considers the extent to which the targets of the parties' sales efforts are the same. *A & H Sportswear, Inc.*, 237 F.3d at 211. Covertech presented evidence at trial that supports a finding that Covertech and TVM targeted the same customers. In particular, the Willow Springs incident discussed above suggests that both TVM and Covertech were targeting Willow Springs as a customer. In consideration

of the similarity of the Covertech and TVM product and the means through with Covertech and TVM advertised their product, namely online, at tradeshows and in trade magazines, the Court finds sufficient evidence that the targets of the parties' sales efforts are the same.

### 9. Factor Nine: Relationship of the Goods in the Minds of Consumers

The ninth factor, the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors, similarly favors Covertech because the rFOIL marks used by Covertech and TVM are identical and serve the same purpose, even though their design and composition might be different. As Dan Higgins' testimony exemplifies, customers are confused by the similarity of rFOIL and Covertech products. This presents a strong example of the strong relationship of the goods in the minds of customers.

### 10. Factor Ten: other facts suggesting that the consuming public might expect the prior owner to expand into the defendant's market.

In considering the tenth factor, the Court finds that the evidence presented at trial supports a finding that consumers may expect that Covertech would have expanded into TVM's market. The consuming public may not have known that the close exclusive distribution relationship between Covertech and TVM had ceased to exist. It was also established at trial that TVM uses the same product numbers as Covertech, a fact that would further heighten a customer's belief that Covertech had expanded into TVM's market. Thus, the Court finds that this factor favors Covertech.

**11. Covertech has established Likelihood of Confusion**

Based on the above considerations, the Court finds that Covertech has established a strong likelihood of confusion among customers. The evidence supports a finding that TVM purposefully adopted the mark as its own after termination of the exclusive distribution agreement. While Covertech only presented the direct testimony of one customer regarding his actual confusion about the origin of the product, the Court also finds the Covertech employees' testimony to be credible regarding customer confusion. Though the Willow Springs incident occurred more than seven years ago, the Court is satisfied that confusion is ongoing. In addition, the Court finds that TVM exercised sufficient control over the www.tvmbuildingproducts.com website to attribute the website to TVM and thus make them liable for the website's use of the rFOIL mark. The parties also advertise through the same channels of trade and target the same customers. All these considerations support a finding of likelihood of confusion.

> **ii. Covertech has proven Federal Trademark Infringement against TVM regarding its rFOIL mark**

Since Covertech has established validity, legal protectability, ownership and likelihood of confusion with regard to TVM's use of its rFOIL mark, all of the elements of a federal trademark infringement claim have been satisfied. The Court therefore finds that TVM is liable to Covertech for federal trademark infringement of Covertech's rFOIL trademark.

### b. Federal trademark Infringement – CONCRETE BARRIER

CONCRETE BARRIER is a registered mark, the certificate of registration of which was admitted at trial. The USPTO added the trademark CONCRETE BARRIER to its supplemental register on September 20, 2005, pursuant to an application filed by Covertech on June 17, 2003. (Exs. 3, 114, ¶ 3). Pursuant to an application filed by Covertech on September 10, 2013, the USPTO added the trademark CONCRETE BARRIER to its principal register on June 3, 2014 as Reg. No. 4,542,586. (Exs. 2, 114, ¶ 4). Thus, Covertech has provided the Court with prima facie evidence of the validity of the registered mark, of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein. *See* 15 U.S.C. § 1115(a). The mark is presumptively valid because it was on the USPTO's supplemental register for nearly eight years and was then added to the principal register. *See E.T. Browne Drug Co. v. Cococare Prods.*, 538 F.3d 185, 189 (3d Cir. 2008) (citing 15 U.S.C. § 1057(b)).

### i. Covertech has established Ownership of its CONCRETE BARRIER mark

Covertech's production of the certificate of registration at trial establishes that it has a legally protectable mark. The Court is also satisfied that Covertech owns the mark. Covertech's employee, John Starr, represented to the Court that it created CONCRETE BARRIER and that the mark has been used in in commerce throughout the United States since 1998. (ECF No. 87, Trial Tr., at 53:10–24). The Court has found Mr. Starr to be

credible. TVM counters that it is in fact the true owner of the mark, because TVM was the first to use the mark in 1998 when it began selling the CONCRETE BARRIER product under the agreement. (ECF No. 96 at 60).

The first party to adopt a trademark can assert ownership rights, provided it continuously uses it in commerce. *See Ford Motor Co.*, 930 F.2d at 292 (citations omitted). In a manufacturer-distributor relationship, sometimes the distributor will own a mark rather than the manufacturer. *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 825 (3d Cir. 2006), *as amended* (May 5, 2006). The mere fact that a manufacturer who already owns a mark enters into an agreement with a distributor to sell the manufacturer's goods does not, by itself, vest ownership of the mark in the distributor. *Id.* at 826. In disputes between a manufacturer and distributor regarding ownership of a mark, courts may first look to contractual expectations. *See id.* (citing 2 *McCarthy on Trademarks* § 16:48). Where there is no contractual provision, courts should look at consumer expectations. *Id.* However, this approach is inapplicable where initial ownership has already been established. *Id.*

The Court finds that TVM did not acquire ownership rights in the CONCRETE BARRIER mark by mere virtue of the fact that it acted as Covertech's distributor. Further, the Court finds that Covertech has established initial ownership of the product. While TVM used the mark in 1998 when it began selling CONCRETE BARRIER pursuant to the exclusive distribution agreement, the mark was initially advertised solely as a Covertech mark. TVM introduced evidence at trial of the September and October 1999 issues of Rural Builder magazine, both of which include advertisements for Covertech CONCRETE BARRIER Foil. (Exs. G, I). Covertech has established that it adopted the mark in the

United States at least as early as 1998, and has continuously used it in commerce since then. The fact that TVM acted as Covertech's distributor for a number of years within that period does not displace the Court's finding that Covertech is the owner of CONCRETE BARRIER.

### ii. Secondary meaning of CONCRETE BARRIER

The parties have not stipulated that the mark is incontestable. Thus, the Court must look to secondary meaning in order to determine validity. "If the mark has not been federally registered or, if registered, has not achieved incontestability, then 'validity depends on proof of secondary meaning, unless the unregistered or contestable mark is inherently distinctive.'" *Ford Motor Co.,* 930 F.2d at 292. Secondary meaning must be established by the plaintiff at the time and place that the defendant began use of the mark. *Id.* (citing *Scott Paper Co.,* 589 F.2d at 1231; J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 15:4 (4th ed.1997)). "Secondary meaning exists when the mark 'is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services.'" *Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.,* 214 F.3d 432, 438 (3d Cir. 2000) (citing *Scott Paper Co.,* 589 F.2d at 1228). In general, secondary meaning "is established through extensive advertising which creates in the minds of consumers an association between the mark and the provider of the services advertised under the mark." *Id.*

The Court considers a non-exclusive list of factors in determining secondary meaning. This non-exclusive list includes: "(1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5)

customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion." *Id.* The more descriptive the term, the greater the evidentiary burden to establish secondary meaning. *See id.* at 441 (citing *McCarthy, Trademarks, § 15:28*).

### 1. Factor One: Extent of Sales and Advertising

Regarding the first factor, Covertech's Vice President John Starr testified at trial that Covertech has sold millions of dollars of its CONCRETE BARRIER product in the United States. (ECF No. 87, Trial Tr., at 74:2–4). In addition, Covertech presented evidence in support of buyer association through the testimony of Kelly Myers, who testified that the CONCRETE BARRIER product was "huge" and one of Covertech's "marquee products." (ECF No. 88, Trial Tr., at 148:4–9). He also stated that he sometimes referred to it as one of Covertech's "flagship products," and that since it was unique and patented, the competition did not have it. (*Id.* at 147:22–148:10). Dan Higgins of Willow Springs testified that he associated CONCRETE BARRIER with Covertech. (ECF No. 88, Trial Tr., at 107:5–7). Covertech also noted that it had advertised its mark extensively by advertising in trade journals, at trade shows, in publications and literature, and on the internet. (ECF No. 87, Trial Tr., at 67:8–14, 86:15–19, 68:9–14; ECF No. 88, Trial Tr., at 138:16–139:3, 159:17–24). Covertech introduced marketing material at trial that indicated that Covertech was the manufacturer of the mark. (Ex. 68). Covertech also introduced evidence of a Sales & Marketing Proposal for Central Reserve stating that "Covertech Fabricating, Inc. (TVM Building Products) warrants rFOIL Products against all defects and material and workmanship for 10 years from the date of purchase." (Ex. 122). This

marketing proposal indicated to customers that Covertech stood behind the rFOIL products.

TVM notes that it did all the marketing for Covertech from 1998 – 2007 during the period of the exclusive distribution agreement (ECF No. 96 at 58). The Court observes that much of the marketing material introduced by Covertech references primarily TVM. Exhibit 13 is a list entitled "USA Label – Identification." (Ex. 13, page 1). The upper left-hand corner has the TVM logo. Exhibits 81 and 95 are marketing materials that bear the TVM logo and contain TVM's contact information. Exhibit 81 adds that "Covertech Fabricating Inc. warrants its rFOIL Insulation Products against all defects in material and workmanship for 10 years from the date of purchase." This suggests to the customer that Covertech is the manufacturer standing behind the product. Covertech recognized that the marketing proposals and advertisements may have suggested to some customers that TVM in fact stood behind the product. John Starr testified for Covertech at trial that he had complained about the fact that the brochures did not state that the product was manufactured by Covertech. (ECF No.87, Trial Tr., at 177:6-11).

The Court finds that Covertech's salespeople gave credible testimony. Further, Dan Higgins, a Covertech customer, testified to his association of CONCRETE BARRIER with Covertech. Covertech advertised its CONCRETE BARRIER product in the September and October 1999 issues of Rural Builder magazine (Exs. G, I). Covertech also introduced a marketing brochure in which Covertech was listed as the product's manufacturer. All of these considerations taken together satisfy the Court that customers associate the CONCRETE BARRIER mark with Covertech.

### 2.    Factor Two: Length of Use

Regarding the second factor, length of use, John Starr testified for Covertech that it had been using the CONCRETE BARRIER mark continuously in interstate commerce throughout the United States since 1998 and it uses it today. (ECF No. 87, Trial Tr., at 66:25–67:7). The Court already considered the length of use in its discussion of Covertech's ownership of the mark. The Court finds Mr. Starr's testimony to be credible and is satisfied that Covertech began to use the product throughout the United States in 1998 and has used it continuously since then. This factor therefore favors Covertech.

### 3.    Factor Three: Exclusivity of Use

As to factor three, exclusivity of use, TVM states that it was permitted by Covertech to use the CONCRETE BARRIER mark during the pendency of their distribution agreement. (ECF No. 96 at 55). Covertech's John Starr stated that pursuant to the exclusive distribution agreement, Covertech had TVM sell Covertech's rFOIL products, including ULTRA NT RADIANT BARRIER, NT RADIANT BARRIER, CONCRETE BARRIER FOIL, CONCRETE UNDERPAD, and ULTRA CONCRETE UNDERPAD. (ECF No. 87, Trial Tr., at 52:3–9). Covertech also confirmed that under the exclusive distribution agreement, TVM was allowed to use Covertech's names in selling Covertech's products. (*Id.* at 57:6–9, 75:8–19).

The Court recognizes that TVM and Covertech were initially under an exclusive distribution agreement under which Covertech agreed to manufacture on an exclusive basis for TVM and TVM agreed to sell and market Covertech's products on an exclusive basis in the U.S. marketplace. (*Id.* at 48:16–21; ECF No. 89, Trial Tr., at 12:3–9). Pursuant to

the agreement, Covertech had TVM sell Covertech's rFOIL products, including CONCRETE BARRIER Foil. (Tr., Starr, 10/20 at 52:3-9). As a result of the agreement, TVM was allowed to use Covertech's names in selling Covertech products. (*Id.* at 57:6–9; 75:8–19). The exclusive distribution agreement between TVM and Covertech ended in 2007. (ECF No. 89, Trial Tr., at 99:15–22). The Court is satisfied that any sale of CONCRETE BARRIER in the United States under the exclusive distribution agreement was made pursuant to Covertech's permission.

According to TVM, the ubiquitous use of the product by various industries makes it impossible for members of the consuming public to determine the source of the product. (ECF No. 96 at 58–59). Covertech counters that any use of its mark by other distributors was either authorized use or unauthorized use by TVM. Mr. Starr testified for Covertech at trial that if other companies are buying Covertech product, they were authorized to use Covertech's product names and numbers. However, if they were not buying Covertech product, then Covertech "would go after them." (ECF No. 87, Trial Tr., at 169:5–11).

The Court is satisfied that Covertech accurately represented the status of the industry, and that it authorized use of its mark by certain distributors. Covertech has exclusively used the CONCRETE BARRIER mark, subject to an agreement with TVM allowing TVM to distribute the CONCRETE BARRIER mark between 1998 and 2007. The mere fact that other distributors in the industry use the Covertech mark does not undermine the Court's finding that Covertech is the exclusive user of the CONCRETE BARRIER mark.

#### 4. Factor Four: The Fact of Copying

Covertech asserts that TVM willfully copied Covertech's mark. As noted above, TVM disputes that it has used the CONCRETE BARRIER mark since it ended its exclusive distribution relationship with Covertech. Covertech states that as of May 1, 2013, TVM was selling products on the www.tvmbuildingproducts.com website using the rFOIL, CONCRETE BARRIER, CONCRETE UNDERPAD, and ULTRA CONCRETE UNDERPAD marks. (ECF No. 97 at 25, citing Exs. 99, 78). The evidence cited by Covertech includes a product catalog that lists "Ultra CBF." (Ex. 69). Covertech states that "CBF" refers to CONCRETE BARRIER Foil. (ECF No. 87, Trial Tr., at 52:19–23, 53:18–20). This assertion is supported by the Covertech marketing material introduced at trial which refers to "Ultra CBF CONCRETE BARRIER Foil." (Ex. 68). The Court finds that the names are sufficiently similar to warrant a finding that TVM was copying Covertech's mark.

Covertech also states that it introduced evidence at trial that TVM used Covertech's marks on TVM's website from 2009 to 2013. (ECF No. 97 at 25, citing ECF No. 87, Trial Tr., at 93:5–94:20; Exs. 19, 67, 87. 93). TVM denies that it has used the CONCRETE BARRIER mark since it ended its exclusive distribution relationship with Covertech. (ECF No. 96 at 55). TVM asserts that it takes care to ensure that the mark is not used on any of its packaging or labels used to send product to its customers, and that it has instructed its customers to ensure that they are not using the CONCRETE BARRIER mark. (*Id.*). TVM claims that it is not responsible for the use of the CONCRETE BARRIER mark on the www.tvmbuildingproducts.com website, as it is a website of a third party over which TVM has no control. (*Id.*). Further, TVM asserted at trial that it if it discovered that one of

its customers was still using the CONCRETE BARRIER mark, it instructed the customer to remove any reference to CONCRETE BARRIER in its materials. (*Id.*).

The Court has already discussed TVM's control over the www.tvmbuildingproducts.com website in its discussion of the rFOIL mark. Contrary to Defendant's assertion, the Court finds that Defendant did have control over the www.tvmbuildingproducts.com website. TVM was able to dictate what was and was not put on the website. The Court finds that the website printouts are evidence of the fact of TVM's copying of the CONCRETE BARRIER mark. The fourth factor therefore favors Covertech.

### 5. Factor Five: Customer Surveys

The fifth factor is neutral, as neither party submitted customer surveys on the question.

### 6. Factor Six: Customer Testimony

Regarding the sixth factor, customer testimony, Covertech's customer Dan Higgins testified that he associated CONCRETE BARRIER with Covertech. (ECF No. 88, Trial Tr., at 107:5–7). In addition, Covertech salespeople testified about customer confusion regarding TVM's use of Covertech marks. (ECF No. 87, Trial Tr., at 135:8–137:5). The Court finds that the Covertech salespeople were credible. Covertech has introduced sufficient evidence of customer testimony to support a finding that customers associate Covertech with CONCRETE BARRIER. In addition, Covertech's evidence established the effect that TVM's use of the CONCRETE BARRIER mark had on

customers who associated the CONCRETE BARRIER mark with Covertech. This factor favors Covertech.

### 7. Factor Seven: The Use of the Mark in Trade Journals

Covertech presented evidence at trial that it had advertised its CONCRETE BARRIER product in trade journals, namely in the September and October 1999 issues of Rural Builder magazine. (Exs. G, I). TVM subsequently advertised the mark in the May 2000 issue of Rural Builder magazine. (Ex. J). TVM claims that it was the entity that used the mark in trade journals in the United States from 1998 until the end of the Agreement in 2007. (ECF No. 96 at 59). However, other than the May 2000 Rural Builder magazine advertisement, TVM did not offer other evidence of any other advertisements in trade magazines.

### 8. Factors Eight and Nine: The Size of the Company and the Number of Sales

The eighth and ninth factors consider the size of the company and the number of sales. Mr. Starr testified that Covertech had a large factory in Canada and that it had sold millions of dollars of products throughout the United States using the CONCRETE BARRIER mark since at least as early as 1998. (ECF No. 87, Trial Tr., at 74:2–4). TVM counters that TVM has greater influence in the United States than in Canada, because Covertech had no presence there until after the agreement ended. (ECF No. 96 at 59). TVM also claims that the number of sales of TVM and Covertech are somewhat equivalent because Covertech did not have any sales in the United States until after the agreement ended. (ECF No. 96 at 59). The fact that Covertech initially sold only to TVM

under the exclusive distribution agreement to distribute its product within the United States does not diminish the Court's finding that Covertech is a large company that sells a large amount of product in the United States. This factor favors Covertech.

### 9. Factor Ten: The Number of Customers

The tenth factor considers the number of customers. Covertech asserts that it has established that it has many customers throughout the United States. (ECF No. 97 at 66). TVM counters that the number of customers is somewhat equivalent because Covertech did not have customers in the United States until after the agreement. (ECF No. 96 at 59). The Court finds Covertech to be credible and finds that this factor favors Covertech.

### 10. Factor Eleven: The Evidence of Actual Confusion

Finally, the eleventh factor considers evidence of actual confusion. The confusion among customers was already considered above. TVM claims that the only evidence of actual confusion occurred seven years ago at Willow Springs, and that Covertech presented no evidence at trial of the label to which Mr. Higgins referred during his testimony. (ECF No. 96 at 59). The Willow Springs incident involved CONCRETE UNDERPAD, rather than CONCRETE BARRIER product. (ECF No. 88, Trial Tr., at 100:2–14). Covertech relies primarily on statements made by its salespeople regarding confusion among customers. Mr. Orologio testified for Covertech that its customers were being confused by TVM's actions, and that it was a "battle" to ensure that customers understood they were no longer buying Covertech product. (ECF No. 90, Trial Tr., at 242:18–22). Covertech's employee Peter Clarke also testified to confusion among Can-Cell, a company that had been informed by Mike Boulding that it could use Covertech's

product numbers to sell TVM's products. (ECF No. 88, Trial Tr., at 40:6–19). Mr. Clarke testified that every time a customer is confused about the product, he sends them a press release about TVM's unauthorized use of Covertech marks and product numbers, and that he uses it "all the time." (ECF No. 88, Trial Tr., at 42:23–44:13). The Court found above that Covertech's salespeople's testimony was credible. The Court is satisfied that Covertech has presented sufficient evidence of instances of actual confusion among customers.

### iii. Covertech has established Secondary Meaning of its CONCRETE BARRIER mark

Covertech has satisfied the Court that it is a large company that extensively advertised its CONCRETE BARRIER product. Further, Covertech has sold its product in interstate commerce since 1998. The length of time, size of the company and extent of advertising support a finding of secondary meaning. The Court recognizes that Covertech did not present any direct testimony by customers of evidence of actual confusion regarding the CONCRETE BARRIER mark. Mr. Higgins, however, testified that he associates CONCRETE BARRIER with Covertech. Considering the factors as a whole, the Court finds that Covertech's salespeople presented credible testimony regarding actual confusion, and that the CONCRETE BARRIER mark has acquired secondary meaning in the minds of customers.

### iv. Likelihood of Confusion regarding CONCRETE BARRIER

Next, the Court must examine the likelihood of confusion. The Court's discussion above regarding the fact of copying in the context of determining secondary meaning is also applicable to the present discussion.

### 1. The degree of Similarity

The Court finds that the degree of similarity factor favors Covertech. At trial, Covertech presented evidence suggesting the degree of similarity between Covertech and TVM product. Exhibit 67 lists the "ULTRA CBF CONCRETE BARRIER Foil." The image is from a website called www.tvmbuildingproducts.com. TVM asserts that it does not control the website, as it is the website of a TVM distributor. (ECF No. 96 at 20). TVM asserts that the same is true of Exhibit 99, which is also an image from www.tvmbuildingproducts.com listing "ULTRA CBF CONCRETE BARRIER Foil." The Court already discussed TVM's influence and control over www.tvmbuildingproducts.com above. The Court determined that Covertech had control over the website. The website printouts can therefore be used as evidence of the fact that TVM's marks are strongly similar to Covertech's marks. Furthermore, Exhibit 70, which was introduced at trial, is a TVM product catalog that lists "TVM Ultra CBF." As the Court already discussed above, "CBF" is an abbreviation related to Covertech's CONCRETE BARRER foil. This Exhibit therefore further supports the fact that there is strong similarity between Covertech's product and TVM's product. The degree of similarity factor thus favors Covertech.

### 2. Factor Two: The Strength of the Owner's Mark

Regarding the strength of the owner's mark, the Court finds that the mark is only moderately conceptually strong because it is descriptive. The name conveys the characteristics of the product, namely a barrier to be placed under concrete. Since the Court finds the mark to be descriptive and has determined that it has acquired secondary meaning, it is a protectable mark. *See A & H Sportswear, Inc.*, 237 F.3d at 222. The Court finds the mark to be commercially strong because of its recognition among customers and its wide advertisement, which the Court already discussed above in connection with the mark's secondary meaning. Covertech has used the mark in interstate commerce since about 1998, and has been using it continuously in the United States since then. (ECF No. 87, Trial Tr., at 66:25–67:7). Mr. Starr also testified that Covertech has been selling millions of dollars of CONCRETE BARRIER product. (*Id.* at 74:2–4). The Court is satisfied that the mark is commercially strong based on Covertech's extensive sales and advertisements.

### 3. Factor Three: The Price of the Goods

The next factor considers the price of the goods. Mr. Starr testified for Covertech that a typical roll of rFOIL products costs $70 to $120. He further testified that Covertech does not sell individual rolls, but rather sells by the truckload, each of which costs $20,000 to $30,000. (*Id.* at 47:1-11). This factor favors Covertech.

### 4. Factor Four: Length of Use without Evidence of Actual Confusion Arising

Regarding the length of time TVM has used the mark without evidence of actual confusion arising, the Court notes that Mr. Starr, Mr. Orologio and Mr. Clarke each

testified about customers' confusion in the marketplace regarding product names. Covertech claims that the confusion was immediate and that Mr. Clarke, Mr. Starr and Mr. Orologio had to clear it up. (ECF No. 97 at 67). The Court already discussed instances of actual confusion in its discussion of secondary meaning. The Court has determined that the Covertech employees were credible in this matter, and that the testimony on this issue is sufficient to find that actual confusion arose soon after TVM started using the product. This factor therefore favors Covertech.

### 5. Factor Five: Intent of the Defendant

With regard to factor five, the intent of the defendant, the Court finds that TVM willfully misappropriated the CONCRETE BARRIER mark. This conclusion is based on the fact that TVM had previously served as Covertech's marketing arm and was familiar with Covertech's product.

### 6. Factor Six: Evidence of Actual Confusion

The sixth factor requires the Court to consider evidence of actual confusion. The Court finds the testimony by Covertech's salespeople to be credible, and that Covertech provided sufficient evidence of actual confusion in the marketplace. The instances of actual confusion were already discussed by the Court above in its discussion of secondary meaning. This factor therefore favors Covertech.

### 7. Factors Seven through Ten

With regard to factors seven to ten, the Court finds that the same considerations apply here as apply to the rFOIL mark. Covertech and TVM market through the same channels of trade, target the same market, there is a strong relationship of the goods in the

minds of customers, and customers would have reason to believe that Covertech had expanded into TVM's market.

### v. Covertech has established Likelihood of Confusion

For all of the foregoing reasons, the Court finds that Covertech presented sufficient evidence of likelihood of confusion among customers. The strongest pieces of evidence provided by Covertech are the testimony by its employees regarding confusion in the marketplace and the printouts from the www.tvmbuildingproducts.com website. In light of the Court's determination that Covertech's employees were credible witnesses, the Court finds the evidence sufficient to establish likelihood of confusion.

### vi. Covertech has proven Federal Trademark Infringement against TVM regarding its rFOIL mark

Covertech has satisfied the three factors necessary to establish a claim for trademark infringement of its CONCRETE BARRIER trademark, and TVM is found to be liable to Covertech therefor.

### vii. Acquiescence

The Court may find that a trademark owner has impliedly consented to another to use its name or mark. "'The doctrine of acquiescence applies when the trademark owner, by affirmative word or deed, conveys its implied consent to another' to use its name or mark." *Zurco, Inc. v. Sloan Valve Co.*, 785 F. Supp. 2d 476, 501 (W.D. Pa. 2011), quoting *Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.*, 143 F.3d 800, 804 (3rd Cir.1998). There is no indication here that Covertech impliedly consented to TVM's use of its mark. Thus, the Court finds that the doctrine of acquiescence is inapplicable here.

### c. Federal Unfair Competition – ULTRA NT RADIANT BARRIER

Federal trademark infringement and federal unfair competition are measured by identical standards. *A&H Sportswear Co.*, 237 F.3d at 210. To prove either form of Lanham Act violation, a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion. *Id.* (citing *Commerce Nat'l Ins. Servs., Inc.*, 214 F.3d at 437). The plaintiff bears the burden of proof. *Id.* at 210–211. Validity depends on secondary meaning. *See E.T. Browne Drug Co.*, 538 F.3d at 199. Just as in a trademark infringement claim, the Court must apply the eleven-factor test to determine secondary meaning. *See id.* (citing C*ommerce Nat'l Ins. Servs.*, 214 F.3d at 438). The Court must also consider the ten-factor test for likelihood of confusion. *Kos Pharms.*, 369 F.3d at 709 (quoting *A & H Sportswear*, 237 F.3d at 212–13).

### i. Ownership of the ULTRA NT RADIANT BARRIER Mark

Covertech asserts that it made the NT RADIANT BARRIER and ULTRA NT RADIANT BARRIER marks and has been using them in interstate commerce since at least as early as 2003. (ECF No. 87, Trial Tr., at 106: 7–17, 13:10–24). Covertech also references invoices that show that Covertech sold ULTRA NT RADIANT BARRIER product to TVM in both the United States and Canada in 2003. (Ex. 5). TVM counters that a sale to one distributor does not constitute a sale in interstate commerce. (ECF No. 101 at ¶ 4).

TVM states that it holds the registration of NT RADIANT BARRIER and ULTRA NT SCIF, that it created the marks for use in commerce as early as 2001, and that it was the first to use those marks in commerce in the United States. (ECF No. 96 at 71). Pursuant

to an application filed by TVM on March 30, 2011 with the United States Patent and Trademark Office ("USPTO") which was added to the principal register on January 16, 2012, TVM is the registered owner of the trademark "ULTRA NT RADIANT BARRIER." (ECF No. 96 at 2, citing Joint Stipulation, ECF No. 79).

Covertech notes that it is not asserting that TVM misused the NT RADIANT BARRIER mark, but only the ULTRA NT RADIANT BARRIER mark. (ECF No. 100 at ¶ 413). Covertech does not dispute that TVM owns the ULTRA NT SCIF BARRIER mark (ECF No. 100 at ¶ 409), but claims that there is no evidence that TVM owns the ULTRA NT RADIANT BARRIER mark. (*Id.* at ¶ 410). Covertech argues that TVM is wrong to assert that it is the owner of the trademark since Covertech has been selling ULTRA NT RADIANT BARRIER at least since 2003, and in 2006 TVM was selling Covertech's ULTRA NT RADIANT BARRIER. (ECF No. 97 at 33).

In response to Covertech's claim, TVM argues that since the end of the agreement, TVM has always used "T" or "TVM' before any use of the ULTRA NT RADIANT BARRIER or ULTRA NT SCIF BARRIER, thereby distinguishing its product from that of any other seller. (ECF No. 96 at 73). TVM also asserts that at the time when the United States Government accepted the ULTRA NT SCIF BARRIER product in 2000, Covertech was not manufacturing the product, but was buying the product from some other company and supplying it to TVM, its only customer in the United States. (ECF No. 96 at 71).

Since Covertech did not register the ULTRA NT RADIANT BARRIER mark, ownership must be proven by continuous use in commerce. The first party to adopt a

trademark can assert ownership rights, provided it continuously uses it in commerce. *Ford Motor Co.*, 930 F.2d at 292.

As the Court already noted above, a distributor may own the trademark in goods it does not manufacture. *Premier Dental Products Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 853 (3d Cir. 1986). "The decisive question is not who manufactured the article sold under a given trademark, but which business or article is symbolized by it." *Id.* (citing *Callmann, Unfair Competition, Trademark and Monopolies* § 17 (4th ed., 1981). "The ownership of a trademark as between a manufacturer and an exclusive distributor is largely determined by the parties' agreement." *Id.* (citing *Model Rectifier Corp. v. Takachiho International, Inc.*, 220 U.S.P.Q. 508, 510 (C.D.Calif.1982), *aff'd* 709 F.2d 1517, 221 U.S.P.Q. 502 (9th Cir.1983); *Mort Wolson Assoc. v. Blaine/Worthington Enterprises,* 211 U.S.P.Q. 146. (S.D.N.Y.1980); *In re George Ball,* 153 U.S.P.Q. 426, 427 (T.T.A.B.1967); 1 McCarthy, *supra,* at § 16:16). However, the agreement between the parties is not dispositive because the ownership of the product's goodwill must also be determined. *Id.*

> If the public believes that the exclusive distributor is responsible for the product, so that the trademark has come, by public understanding, to indicate that the goods bearing the trade-mark come from plaintiff although not made by it, or if the distributor has obtained a valuable reputation for himself and his wares by his care in selection of his precautions as to transit and storage, or because his local character is such that the article acquires a value by his testimony to its genuineness, that is proof that he possesses the goodwill associated with the product.

*Id.* (internal citations and quotations omitted). "[W]hile the identity of the party exercising day-to-day control over the quality of a product is often relevant to trademark analysis, it is not essential that one perform this function to own a trademark." *Id.* at 856. One need

not manufacture a product to possess goodwill in it. *Id.* "[I]t has been consistently held that if an exclusive distributor is known as the exclusive domestic source and as the one who stands behind the product in this country, it may own and enforce the trademark." *Id.* (citations omitted).

The Court finds that Covertech is the owner of the ULTRA NT RADIANT BARRIER mark. Covertech's employees' testimony has satisfied the Court that Covertech sold the mark as early as 2003 and has been selling it in interstate commerce since then. Initially the sale was made to TVM as Covertech's exclusive distributor. However, the Court finds the sales since 2003 to have been sufficiently public to warrant a finding that Covertech has sold the product in interstate commerce since 2003. Covertech has therefore established ownership of the ULTRA NT RADIANT BARRIER mark.

### ii. Secondary meaning of ULTRA NT RADIANT BARRIER

Where a mark has not been federally registered or has not achieved incontestability, validity depends on proof of secondary meaning, unless the unregistered contestable mark is inherently distinctive. *See Ford Motor Co.*, 930 F2d at 291. The Court must look to secondary meaning here because the ULTRA NT RADIANT BARRIER mark is not incontestable. Secondary meaning requires consideration of the eleven-factor test laid out above. *Id.*

### 1. Factor One: Extent of Sales and Advertising

Regarding the extent of sales and advertising, Covertech presented to the Court that it has extensively advertised its ULTRA NT RADIANT BARRIER product since 2003 throughout the United States. (ECF No. 87, Trial Tr., at 82:16–19). Covertech also

presented evidence of marketing material that mentions ULTRA NT RADIANT BARRIER. (Exs. 6, 9, 66, 81, and 113). Exhibit 6 is a brochure stating "What Every Builder Should Know about rFOIL Insulation Products." The brochure lists ULTRA NT RADIANT BARRIER rFOIL and bears Covertech's logo. It also states "represented by TVM." Exhibit 9 is an application manual listing ULTRA NT RADIANT BARRIER for SCIF's, which also bears Covertech's logo. Exhibit 66 is a printout from www.rFOIL.com about "ULTRA NT RADIANT BARRIER – (SCIF's)."

Exhibit 81 is another marketing brochure mentioning ULTRA NT RADIANT BARRIER rFOIL. The brochure only bears TVM's logo, though it mentions that Covertech Fabricating covers the warranty. Exhibit 113 is a sales and marketing proposal mentioning ULTRA NT RADIANT BARRIER rFOIL, stating that "Covertech Fabricating, Inc. (TVM Building Products) warrants ULTRA rFOIL Products against all defects in material and workmanship for 25 years from the date of purchase." (Ex. 113, page 10). Covertech asserts that advertising was successful because it had led to buyer association and the government specification of the SCIF barrier. (ECF No. 97 at 70). The Court is satisfied that Covertech has extensively advertised its ULTRA NT RADIANT BARRIER product in marketing material and on the internet. This factor favors Covertech.

### 2. Factor Two: Length of Use

Regarding the length of use, Covertech introduced receipts from 2003 as evidence that it had used the mark in the United States as early as 2003. (Ex. 5). Though Covertech initially used TVM as its exclusive distributor, the Court finds the sales receipts to be

sufficient to establish that Covertech began to use the mark in 2003 and continues to use it to this day.

### 3. Factor Three: Exclusivity of Use

Mr. Starr testified that Covertech makes known to the industry that if customers want to buy ULTRA NT RADIANT BARRIER, they can go to another distributor, Ecofoil, to buy it. (ECF No. 87, Trial Tr., at 174:24–125:6). According to Mr. Starr and Mr. Clarke, all other uses of the ULTRA NT RADIANT BARRIER mark on the internet were either authorized uses or were unauthorized uses by TVM or one of TVM's distributors or suppliers. (ECF No. 87, Trial Tr., at 218:13–17; ECF No. 88, Trial Tr., at 46:18–49:5). The Court finds that the exclusivity of use factor favors Covertech, and that Covertech has provided a credible explanation for the use of its mark by other distributors. The Court finds that Covertech has exclusively used the mark since 2003, and that any uses by other distributors were authorized by Covertech.

### 4. Factor Four: The Fact of Copying

Regarding the fact of copying, Covertech asserts that TVM improperly used Covertech's ULTRA NT RADIANT BARRIER from 2010 to 2013, despite being aware that Covertech had used the mark with its products long before then. (ECF No. 97 at ¶ 134, citing ECF No. 87, Trial Tr., at 105:24–106:6; Ex. 5). Covertech introduced evidence at trial to support its assertion that TVM had used Covertech's marks on TVM's website from 2009 to 2013. (Exs. 19, 87). Exhibit 87 is a printout from TVM's official website, www.tvmi.com, listing "NT Radiant Barrier" and "Ultra NT Radiant Barrier."

Covertech also states that it presented evidence of improper use. (ECF No. 97 at ¶ 134, citing Exs. 11, 17, 19, 69, 70, 72, 84, 87). Exhibit 11 is the mark information for TVM's ULTRA NT RADIANT BARRIER registration. Exhibit 17 is a printout from www.blueridgecompany.com, listing "TVM ULTRA NO-TEAR (NT) Radiant Barrier." Exhibit 69 is a TVM product catalog listing "TVM Standard NT Radiant Barrier for Attics." Exhibit 70 is a TVM product catalog listing "TVM Ultra NT – SCIF Barrier." Exhibit 72 is a printout from www.tvmi.com with information about the Ultra NT Radiant Barrier. Exhibit 74 is a TVM Technical Data Sheet for Ultra NT Radiant Barrier. Exhibit 84 contains a photocopy of a sample of Standard NT Radiant Barrier.

According to Covertech, other than in connection with TVM's distribution of Covertech products, Covertech never gave TVM permission to use the ULTRA NT RADIANT BARRIER in the United States. (ECF No. 87, Trial Tr., at 57:6–9; 114:22–24).

TVM counters that it could not have improperly used the ULTRA NT RADIANT BARRIER mark because TVM owns it and registered it with the USPTO (Ex. 11), and TVM created and developed the mark. (ECF No. 101 at ¶ 38). Further, TVM states that Exhibit 67 does not show TVM's website, but rather a third party website, and that the only use on TVM's actual website is of those marks TVM created, developed and registered. (ECF No. 101 at ¶ 39).

The Court finds that Covertech created the mark and began to use it in 2003. The fact that TVM subsequently registered the mark with the USPTO does not displace the Court's finding that Covertech is the rightful owner of ULTRA NT RADIANT BARRIER.

The Court finds Covertech's witnesses to be credible, and that Covertech presented sufficient evidence to find that TVM copied the ULTRA NT RADIANT BARRIER mark.

### 5. Factor Five: Customer Surveys

Neither party presented evidence of customer surveys. This factor is therefore neutral.

### 6. Factor Six: Customer Testimony

The sixth factor considers customer testimony. Covertech's customer, Dan Higgins of Willow Springs, testified that he associated ULTRA NT RADIANT BARRIER with Covertech. (ECF No. 88, Trial Tr., at 107:2-12). Covertech also presented testimony by its salespeople, Mr. Clarke and Mr. Myers, regarding interactions with customers in the market who associate ULTRA NT RADIANT BARRIER with Covertech. (ECF No. 97 at 71).

TVM has presented no evidence in support of its assertion that customers associated the ULTRA NT RADIANT BARRIER mark with TVM. In contrast, Covertech presented persuasive evidence in the form of testimony by Dan Higgins of Willow Springs and Covertech's salespeople regarding strong customer association. Thus, the Court finds that the customer testimony factor favors Covertech.

### 7. Factors Seven, Eight and Nine

Factors seven and eight, regarding the use of the mark in trade journals, the size of the company, and the number of sales, have already been considered with regard to rFOIL and CONCRETE BARRIER, and also favor Covertech. Regarding the number of sales, Mr. Starr stated that Covertech had made millions of dollars of sales of the product,

especially because of the specification for use in government buildings. (ECF No. 97 at 71). The Court finds that this factor also favors Covertech.

The Court's same findings above regarding the number of sales also apply here. The number of sales factor favors Covertech.

### 8. Factor Ten: The Number of Customers

The tenth factor requires the Court to consider the number of customers. Covertech argues that the evidence at trial established that Covertech had a significant number of potential and existing customers because its ULTRA NT RADIANT BARRIER was specified for use in the construction of SCIF facilities in federal buildings. (ECF No. 97 at 71). The Court is satisfied that Covertech had a large number of customers based on its salespeople's testimony.

### 9. Factor Eleven: Evidence of Actual Confusion

Finally, the Court must look at evidence of actual confusion. Mr. Clarke and Mr. Starr testified for Covertech that customers believed they could get the product through TVM. (ECF No. 97 at ¶ 361). TVM states that since the end of the agreement with Covertech it has always used "T" or "TVM" before any use of the Ultra NT Radiant Barrier or Ultra NT SCIF Barrier, thus distinguishing TVM product from that of any other seller. (ECF No. 96 at 73). Covertech did not present any direct testimony by customers regarding instances of actual confusion. However, the Court finds that Covertech's salespeople were credible in presenting to the Court that there were instances of actual confusion among customers. The Court does not find that TVM's use of "TVM" or "T"

before the product names was sufficient to dispel the actual confusion caused by TVM's use of the ULTRA NT RADIANT BARRIER mark. This factor also favors Covertech.

### iii. Covertech has established Secondary Meaning of its ULTRA NT RADIANT BARRIER mark

The Court finds that Covertech presented sufficient evidence to support a finding that the ULTRA NT RADIANT BARRIER mark has acquired secondary meaning in the minds of its customers. TVM has no basis to support its claim that customers associate the mark with TVM other than its own testimony at trial. While the Court has found Covertech's salespeople to be credible, it has not found TVM's employees to be credible overall. Covertech presented evidence by Mr. Higgins and its own salespeople that there is strong customer association between Covertech and ULTRA NT RADIANT BARRIER. In addition, Covertech presented sufficient evidence to establish that it had created the ULTRA NT RADIANT BARRIER mark. The Court therefore finds that the mark has acquired secondary meaning in the minds of customers.

### iv. Likelihood of Confusion

The Court must next consider the ten-factor test to determine likelihood of confusion among customers.

### 1. Factor One: Degree of Similarity

The first factor of the likelihood of confusion analysis is the degree of similarity between the owner's mark and the alleged infringing mark. The Court notes that TVM identifies its products by using "T" or "TVM" before any of its ULTRA NT RADIANT

BARRIER or ULTRA NT SCIF BARRIER products. Despite this minor difference in mark, the Court finds the marks used by Covertech and TVM to be largely identical.

### 2. Factor Two: Strength of the Owner's Mark

The Court finds that the mark should be classified as suggestive, because the word "ultra" conveys something strong and durable, and "radiant barrier" itself is a descriptive mark. The mark is therefore eligible for trademark protection. The mark is commercially strong because Covertech has extensively advertised it (Exs. 6, 9). The Court already discussed Covertech's advertising efforts in its above section on secondary meaning. The testimony presented by Covertech at trial supports a finding that the mark was well-known by consumers in the reflective insulation market. (ECF No. 88, Trial Tr., at 107:2–12). Covertech states that it has used the mark since about 2003, that it has advertised its ULTRA NT RADIANT BARRIER for years, and that it has achieved extensive sales. (ECF No. 97 at 73). The Court finds Covertech's testimony to be credible on all points. The mark is both conceptually and commercially strong, and this factor therefore favors Covertech.

### 3. Factor Three: Price of the Goods

The third factor, namely the price of goods and other factors indicating care and attention, has already been discussed above with regard to rFOIL and CONCRETE BARRIER. Covertech sells its goods at a high price. The high price suggests that customers exercise a high degree of care in choosing their product.

### 4. Length of Use without Evidence of Actual Confusion Arising

Covertech argues that TVM's use of the ULTRA NT RADIANT BARRIER mark is also causing confusion because when contractors see the specification, and they look for it online, they see that they can get it from TVM and Covertech loses the sale and the customer does not receive a product made by Covertech. (ECF No. 87, Trial Tr., at 209:14–213:1). Covertech asserts that as soon as TVM started using ULTRA NT RADIANT BARRIER, customers were confused. While TVM claims to have developed the mark and started using it as early as 2001, Covertech states that it began to use the mark in 2003. Covertech supported its assertion with testimony by its salespeople. The Court finds sufficient evidence to establish that Covertech was the first to use the mark and that actual confusion arose soon after TVM began using the mark. The Court finds insufficient evidence to support TVM's assertion that it began to use the mark earlier than Covertech did. This factor therefore favors Covertech.

### 5. Factor Five: the Intent of Defendant

Factor five, the intent of the Defendant in adopting the mark, equally favors Covertech. The Court finds that TVM intentionally adopted the ULTRA NT RADIANT BARRIER mark, knowing that Covertech had initially used it in the market. The Court is not persuaded that TVM was the creator of the mark.

### 6. Factor Six: Evidence of Actual Confusion

Covertech presented general instances of confusion among customers about the origin of TVM and Covertech product. Covertech's Vice President, John Starr, noted that

the ULTRA NT RADIANT BARRIER mark was causing confusion among contractors who see that they can get the specification both from TVM and Covertech. (ECF No. 87, Trial Tr., at 209:14–213:1). The Court finds this testimony to be sufficient evidence of actual confusion among Covertech's customers.

### 7. Factors Seven through Ten

Factor seven considers whether the products are marketed through the same channels of trade, factor eight considers whether the targets of the sales' efforts are the same, factor nine considers the relationship of the goods in the minds of customers, and factor ten considers others facts that would make customers think that Covertech had expanded into TVM's market. The evidence at trial establishes that TVM and Covertech target the same customers, that they are marketed through the same channels, that they serve similar functions, and that the public might therefore assume that Covertech might have expanded into the owner's mark. Mr. Starr testified for Covertech that Covertech was and is trying to sell its products in the same market and to the same customers as TVM. (ECF No. 87, Trial Tr., at 133:25–134:5). Given the fact that TVM previously acted as Covertech's distributor, customers might not know that the relationship between them had ended and might therefore think that Covertech had expanded into TVM's market. The same considerations as applied in the rFOIL and CONCRETE BARRIER discussion of these factors also apply here.

### v. Covertech has established Likelihood of Confusion

Based on all of the foregoing reasons, the Court finds that Covertech has established a likelihood of confusion regarding TVM's use of the ULTRA NT RADIANT BARRIER mark.

### vi. Covertech has established an Unfair Competition Claim against TVM

Based on the above factors, the Court finds that Covertech has succeeded in establishing an unfair competition claim against TVM. Covertech has established that it initially used the mark in interstate commerce in 2003 and has been continuously using it since then. The mark has acquired secondary meaning in the minds of customers due to extensive advertising and customer association. This fact was established both by Dan Higgins' testimony and Covertech's own salespeople's testimony. TVM failed to produce evidence that customers associated ULTRA NT RADIANT BARRIER with TVM. The fact that TVM now uses "T" or "TVM" in front of "ULTRA NT RADIANT BARRIER" does not dispel the confusion. Further, as the Court will discuss below, TVM fraudulently obtained its registration of the ULTRA NT RADIANT BARRIER mark. Covertech has established likelihood of confusion based on the strong similarity of the products, the instances of actual confusion among customers, and the fact that the product is marketed by TVM and Covertech through the same channels of trade. For all of the foregoing reasons, the Court finds that TVM is liable to Covertech for unfair competition.

### d. Federal Unfair Competition – (ULTRA) CONCRETE UNDERPAD

In order to prevail on its federal unfair competition claim regarding (ULTRA) CONCRETE UNDERPAD, Covertech must establish the same elements as above.

### i. Ownership of (ULTRA) CONCRETE UNDERPAD

Where a trademark is not registered, ownership may be established by first and continuous use in the market. According to John Starr, Covertech has been using the CONCRETE UNDERPAD and ULTRA CONCRETE UNDERPAD marks in in interstate commerce since about 2003 or 2004. (ECF No. 87, Trial Tr., at 53:10–24, 83:11–13). He also stated that Covertech had been using the CONCRETE UNDERPAD mark continuously throughout the United States since then and still uses it today. (*Id.* at 83:23–25). The Court finds Mr. Starr's testimony regarding ownership and first use to be credible. Covertech has succeeded in establishing ownership of this mark through first and continuous use in interstate commerce.

### ii. Secondary Meaning of (ULTRA) CONCRETE UNDERPAD Mark

Since the mark has not reached the status of being indisputable, the Court must look to secondary meaning.

### 1. Factor One: Extent of Sales and Advertising

Covertech presented the technical data sheet for ULTRA CONCRETE UNDERPAD at trial. (Ex. 10). Covertech also introduced samples of its ULTRA CONCRETE UNDERPAD product. (Exs. 118, 119). Covertech presented evidence that it has been using the mark since about 2003 or 2004, and that the marks have been associated with Covertech since then. (ECF No. 87, Trial Tr., at 53:10–24, 83:11–13). Mr.

Higgins' testimony regarding his association of CONCRETE UNDERPAD and ULTRA CONCRETE UNDERPAD with Covertech provides support for the fact that customers associate those marks with Covertech. (ECF No. 88, Trial Tr., at 107:2–12). The Court finds that this first factor favors Covertech. Covertech has presented sufficient evidence of the fact that buyers associate the ULTRA CONCRETE UNDERPAD mark with Covertech.

### 2. Factor Two: Length of Use

The Court is also satisfied that the length of use element has been established here. According to Covertech's salespeople, which the Court has deemed to be credible, Covertech began to use the ULTRA CONCRETE UNDERPAD mark in 2003 or 2004, and continues to use it today.

### 3. Factor Three: Exclusivity of Use

Regarding factor three, the exclusivity of use, TVM claims that it sold the product under this mark for approximately 10 years prior to termination of the exclusivity agreement and continued to sell for seven years thereafter. (ECF No. 96 at 65). TVM also asserts that it created the mark under the TVM name and that TVM has continued to use it since then (*Id.*). TVM further states that a number of members of the insulation and construction industries use the mark. (*Id.*). Despite TVM's assertions, the Court finds that Covertech was the exclusive user of the ULTRA CONCRETE UNDERPAD mark, and that any use of the mark was either authorized by Covertech or unauthorized use by TVM or one of its distributors.

### 4. Factor Four: The Fact of Copying

The fourth factor considers the fact of copying. Covertech claims that as of May 1, 2014, TVM was selling products on the www.tvmbuildingproducts.com website using CONCRETE UNDERPAD and ULTRA CONCRETE UNDERPAD marks. (ECF No. 97 at 25, citing Exs. 99, 78). Exhibit 78 is a printout from www.tvmbuildingproducts.com that specifically mentions ULTRA CONCRETE UNDERPAD. Covertech has cited Exhibits 67, 69, 70, 84, 87, 93, 96 and 103 as evidence of improper use. (ECF No. 97 at 25). Exhibit 67 is a printout from www.tvmbuildingproducts.com listing ULTRA CONCRETE UNDERPAD and CONCRETE UNDERPAD. Exhibit 69 is a TVM product catalog listing ULTRA CONCRETE UNDERPAD and CONCRETE UNDERPAD. Exhibit 70 is a TVM product catalog listing "TVM Ultra Concrete Underpad" and "TVM Concrete Underpad." Exhibit 84 contains photocopies of an HVAC Insulation Sample Kit, including a TVM Concrete Underpad sample and a page listing information about Concrete Underpad. Exhibit 87 is a printout from www.tvmi.com listing ULTRA CONCRETE UNDERPAD. Exhibit 93, already discussed above, is also a printout from www.tvmi.com with information about CONCRETE UNDERPAD. Exhibit 96 is a printout from www.tvmuildingproducts.com with information about Concrete Underpad. Exhibit 103 is an HVAC Price List (USA) including prices for ULTRA CONCRETE UNDERPAD and CONCRETE UNDERPAD. All of this evidence supports a finding that TVM copied the CONCRETE UNDERPAD and ULTRA CONCRETE UNDERPAD mark. This factor favors Covertech.

### 5. Factor Five: Customer Surveys

Neither party presented customer surveys. Thus, this factor remains neutral.

### 6. Factor Six: Customer Testimony

Factor six further supports a finding of secondary meaning regarding CONCRETE UNDERPAD and ULTRA CONCRETE UNDERPAD. Mr. Higgins of Willow Springs testified that he associates CONCRETE UNDERPAD and ULTRA CONCRETE UNDERPAD with Covertech. (ECF No. 88, Trial Tr., at 107:2–121).

### 7. Factor Seven: The Use of the Mark in Trade Journals

The evidence offered at trial regarding Covertech's use of the mark in trade journals was already considered above with regard to Covertech's other marks. This factor favors Covertech.

### 8. Factors Eight, Nine and Ten

Regarding the number of sales, the number of customers, and the size of the company, Covertech testified that it had successfully sold the product, resulting in millions of dollars of sales. Covertech testified that it sells to a number of customers in the market. The same discussion that applied to Covertech's sales and customers of rFOIL, CONCRETE BARRIER and ULTRA NT RADIANT BARRIER also applies here.

### 9. Factor Eleven: The Evidence of Actual Confusion

Regarding instances of actual confusion, Dan Higgins' testimony provided evidence of an instance of actual confusion in a customer. He testified that he was confused when he purchased rFOIL CONCRETE UNDERPAD from TVM which was dissimilar to what he had seen during a tour of the Covertech plant. (ECF No. 88, Trial Tr.,

at 98:13–99:19, 100:2–102:23). He sent the product to Covertech for inspection, which confirmed that it was not Covertech product. (*Id.* at 100:20–102:13).

Covertech's salespeople also testified about an incident involving Worldwide Plumbing wherein Worldwide Plumbing called Mr. Clarke for a quote on CONCRETE UNDERPAD. (ECF No. 88, Trial Tr., at 38:5–39:17). The customer informed Mr. Clarke that it had received a quote for the exact same product name and number form TVM that was less expensive. (*Id.*). Mr. Clarke had to explain who TVM was and that product from TVM was not manufactured by Covertech. (*Id.*). The Court finds that Covertech has presented sufficient evidence of instances of actual confusion.

### iii. Covertech has established Secondary Meaning of (ULTRA) CONCRETE UNDERPAD

All of the above considerations support a finding that CONCRETE UNDERPAD and ULTRA CONCRETE UNDERPAD have acquired secondary meaning in the minds of customers. Covertech has established that it was the first to use the mark. Further, Covertech provided persuasive evidence of customer association in the form of testimony by Dan Higgins, who also testified to an instance of actual confusion involving the CONCRETE UNDERPAD mark. For all these reasons, the Court finds that Covertech has established secondary meaning among customers.

### iv. TVM's Ownership Assertion

TVM claims that if CONCRETE UNDERPAD is protectable, it is owned by TVM. (ECF No. 96 at 66). TVM also notes that it exercised control over the quality of the product, that TVM was looked to by customers as standing behind the goods, and that

TVM received customer complaints. (*Id.*). TVM argues that any use of the product is fair use anyway. (*Id.*).

The Court is not persuaded by any of TVM's arguments. While TVM acted as the marketing arm for Covertech, customers nonetheless associated the CONCRETE UNDERPAD mark with Covertech. TVM provided the Court with no convincing evidence to suggest otherwise.

### v. Likelihood of Confusion regarding (ULTRA) CONCRETE UNDERPAD

#### 1. Factor One: Degree of Similarity

Covertech claims that the marks are identical. (ECF No. 97 at 76). TVM asserts that it created the mark under the TVM name. (ECF No. 96 at 65). The Court finds that the evidence already considered above with regard to secondary meaning supports a finding of strong similarity between TVM's mark and Covertech's mark.

#### 2. Factor Two: Strength of Covertech's (ULTRA) CONCRETE UNDERPAD Mark

The second factor considers the strength of the owner's mark. The Court finds that the CONCRETE UNDERPAD mark is descriptive, as it describes the product. Since the mark is descriptive, it is capable of trademark protection. While conceding that the mark is descriptive and therefore only moderately conceptually strong, Covertech argues that the mark is commercially strong because Covertech has been using the mark since the early 2000s, it has extensively advertised the mark since then, it has achieved extensive sales and the marks are well-known. (ECF No. 97 at 77). TVM argues that the mark is not a strong one because Concrete Underpad is a generic mark for a category of product,

namely a pad that is put under concrete. (ECF No. 96 at 65). The same considerations that led the Court to find that the mark had acquired secondary meaning also support a finding that CONCRETE UNDERPAD is a commercially strong mark. The mark has been advertised and sold by Covertech to an extent that has led to customer association. The Court finds that this second factor favors Covertech because the mark is commercially strong.

### 3. Factor Three: The Price of (ULTRA) CONCRETE UNDERPAD

The third factor was already discussed above with regard to the other marks. This factor favors Covertech.

### 4. Factor Four: The Length of Time (ULTRA) CONCRETE UNDERPAD has been used without Evidence of Actual Confusion arising

Covertech provided evidence that the confusion among customers happened soon after TVM began to use the mark. Covertech gave specific instances in the form of testimony by Dan Higgins and testimony by Mr. Clarke. The Court finds that this factor favors Covertech.

### 5. Factor Five: TVM's Intent in adopting (ULTRA) CONCRETE UNDERPAD

The Court finds that this factor favors Covertech, as Covertech has established that the marks were identical, and that TVM had knowledge that Covertech used the CONCRETE UNDERPAD mark. The Court finds that TVM intentionally adopted the CONCRETE UNDERPAD mark, despite knowing that Covertech had created the mark.

### 6. Factor Six: Evidence of Actual Confusion

Factor six considers evidence of actual confusion. As the Court noted above in its discussion of secondary meaning, Covertech presented evidence of actual confusion among customers in the form of testimony by Dan Higgins of Willow Springs and Covertech's Mr. Clarke. The Court has determined Mr. Higgins to be credible. The testimony was persuasive evidence of actual confusion among customers.

### 7. Factors Seven to Ten

The above discussion regarding factors seven to ten of the likelihood of confusion analysis for Covertech's rFOIL, CONCRETE BARRIER and ULTRA NT RADIANT BARRIER marks are also applicable here.

### vi. Covertech has established Likelihood of Confusion

For all of the foregoing reasons, the Court finds that Covertech has established a likelihood of confusion among customers regarding CONCRETE UNDERPAD and ULTRA CONCRETE UNDERPAD. Covertech has established the strong similarity of products, and that there is evidence of actual confusion among customers.

### vii. Covertech has established Liability for Federal Unfair Competition

Having established all of the elements of a federal unfair competition claim, the Court finds that TVM is liable to Covertech for federal unfair competition.

### e. Common Law Unfair Competition

Common law liability for unfair competition, including trademark infringement, is governed by local law, though federal law serves as persuasive authority. *Pennsylvania*

*State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 870 (Pa. Super. Ct. 1998) (internal citations omitted). As with federal law, the common law of trademarks is a portion of the broader law of unfair competition. *Id.* The action for unfair competition exists separate and apart from any statutory rights which the owner of the trademark possesses. *Id.* The underlying principle of law of unfair competition is to prevent substitution by deception. *Id.*

"The law of unfair competition also requires that a company, entering a field already occupied by a rival of established reputation, 'must do nothing which will unnecessarily create or increase confusion between his goods or business and the goods or business of the rival.'" *Id.* at 870–871 (citations omitted). A party may enjoin the trading on another's business reputation by use of deceptive selling practices or other means on the grounds of unfair competition. *Id.* If the particular use is reasonably likely to produce confusion in the public mind, equity will restrain the unfair practice and compel an accounting of the profits gained thereby. *Id.* (citations omitted).

As with federal law, descriptive, geographical and generic words, as well as words of common or general usage belong to the public and are not capable of exclusive appropriation. *Id.* (citing *Golden Slipper Square Club v. Golden Slipper Restaurant & Catering, Inc.*, 88 A.2d 734, 736 (Pa. 1952)). However, a competitor's use of a name, label, symbol or trademark may be enjoined where the mark has acquired a secondary meaning. *Id.* (citing *Zimmerman v. Holiday Inns of America, Inc.*, 266 A.2d 87, 90 (1970)). In order to establish secondary meaning, it must be shown that people in the trade or the purchasing public perceives the word or name as standing for the business of a particular company. *Id.*

"A generic term, even where it has developed a secondary meaning, is never granted trademark protection. Nonetheless, an action for unfair competition on the basis of a likelihood of confusion may still lie." *Id.* (citations omitted).

The Pennsylvania common law tort of unfair competition is coextensive with the Lanham Act, except for the federal requirement of interstate commerce, where a plaintiff's claim focuses on a defendant's appropriation of the plaintiff's "mark" "with the intent of falsely linking the defendant's product with the plaintiff and capitalizing on the plaintiff's goodwill." *Giordano v. Claudio*, 714 F. Supp. 2d 508, 521 (E.D. Pa. 2010) (citations omitted).

"Pennsylvania common law traditionally defines unfair competition as the 'passing off' of a rival's goods as one's own, creating confusion between one's own goods and the goods of one's rival." *Id.* (citing *Scanvec Amiable Ltd. v. Chang*, 80 Fed.Appx. 171, 180 (3d Cir. 2003)). However, it is not limited to passing off. *Id.* (citing *Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 319 (3d Cir.1995)). "Pennsylvania courts have recognized a cause of action for the common law tort of unfair competition where there is evidence of, among other things, trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information." *Id.* (quoting *Synthes (U.S.A.) v. Globus Med., Inc.*, Civ. A. No. 04–1235, 2005 WL 2233441, at *8 (E.D.Pa. Sept. 14, 2005)).

The Pennsylvania common law tort of unfair competition is coextensive with the definition set forth in the Restatement (Third) of Unfair Competition. *Id.* However, the term may not be construed "as a virtual catch-all for any form of wrongful business

conduct" or to "include all forms of modern business torts." *Id.* (citing *USX Corp. v. Adriatic Ins. Co.*, 99 F.Supp.2d 593, 619 (W.D.Pa.2000)).

TVM notes that Covertech's common law unfair competition claim is essentially a duplication of its unfair competition and trademark infringement claims under the Lanham Act. (ECF No. 96 at 74). Thus, TVM argues that Covertech's claims of common law unfair competition also fail for the same reasons that their federal unfair competition claims fail. (*Id.* at 75). Covertech, on the other hand, argues that its claim should succeed because it has proven that all of its marks, including rFOIL, CONCRETE BARRIER, CONCRETE UNDERPAD, ULTRA CONCRETE UNDERPAD, and ULTRA NT RADIANT BARRIER, have acquired secondary meaning in the minds of consumers. (ECF No. 97 at 79). Covertech argues that even if the marks are considered to be generic, Covertech is still entitled to recover on its unfair competition claim in light of the high likelihood of confusion in this case because TVM used the same product names and numbers. (*Id.*).

Since the Pennsylvania common law tort of unfair competition is coextensive with federal unfair competition under the Lanham Act, the Court finds that the same analysis as above should apply here. The Court found above that Covertech had made out its claims under federal law, and the Court therefore finds here that Covertech has sufficiently established its state law claims of unfair competition as well. The Court finds in favor of Covertech on this count.

### f. Damages

§ 1117 of the Lanham Act provides for the relief available to a Plaintiff who successfully asserts a trademark infringement or unfair competition claim:

> […] the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a).

An "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. *See Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 314 (3d Cir. 2014). It is thus within a court's discretion to find a case "exceptional" based upon the governing law and the facts of the case, irrespective of whether the losing party is culpable. *Id.* Whether litigation positions or litigation tactics are "exceptional" enough to merit attorneys' fees must be determined by the district courts "in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* (citing *Octane Fitness*, 134 S.Ct. at 1756).

That discretion is not cabined by a threshold requirement that the losing party acted culpably, though the losing party's blameworthiness may well play a role. *See id.*

The statute further provides that:

> In assessing damages under subsection (a) for any violation of section 1114(1)(a) of this title or section 220506 of Title 36, in a case involving use of a counterfeit mark or designation (as defined in section 1116(d) of this title), the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of (1) intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services….

15 U.S.C. § 1117(b).

### i. Damages pursuant to 15 U.S.C. § 1117(a), (b)

Covertech introduced TVM sales figures from 2009 to 2013 evidencing TVM sales in the metal building industry in the amount of $5,791,927. The metal building industry uses rFOIL products such as CONCRETE BARRIER, CONCRETE UNDERPAD, and ULTRA CONCRETE UNDERPAD.

Covertech is entitled to recover TVM's profits. 15 U.S.C. § 1117(a)(1). To establish profits Covertech is only required to prove TVM's sale. 15 U.S.C. § 1117(a)(3). Once the sales figure is established, then the statute provides that Defendant must prove any costs or deductions from the amount. *Id.* Mr. Boulding asserted that his profit margin was around 30%. (ECF No. 89, Trial Tr., at 108:13– 15). TVM has failed to introduce evidence to support this assertion, and the Court therefore determines that no cost or deduction has been proved.

The statute also provides for the award of statutory damages for the use of counterfeit marks in lieu of proved damages or profits for the use of counterfeit marks under 15 U.S.C. § 1117(b). The Court will assess damages by calculating an amount of damages or profits under 15 U.S.C. §§1117(a) and (b), and will then compare that amount to the amount of statutory damages that can be awarded under 15 U.S.C. § 1117(c).

The TVM sales data for the metal building industry introduced by Covertech establishes sales in the amount of $5,791,927. (Ex. 25). The Court finds that damages in this amount would be excessive. Therefore, the Court will use its discretion to reduce the amount by 30% to $4,054,349, which the Court finds to be just under the circumstances of this case. *See* 15 U.S.C. § 1117(a).

Pursuant to 15 US.C. § 1117(b), since this case involves TVM′s intentional use of a counterfeit mark, knowing such mark to be a counterfeit mark, the Court is to enter judgment for three times the profits from such use, unless there are extenuating circumstances. Since, under the circumstances of this case, the Court is unable to determine which amount of the sales are attributable to the counterfeit rFOIL and CONCRETE BARRIER marks, it is unable to award three times such profits pursuant to 15 U.S.C. §1117(b) for use of a counterfeit mark. However, in exercising its discretion to award $4,054,349 in damages, the Court takes into account the fact that TVM willfully used a counterfeit mark by using rFOIL and CONCRETE BARRIER.

In addition, the Court awards 3% prejudgment interest on the award of $4,054,349, resulting in an amount of $268,920. The Court calculated this amount by using the period of May 28, 2013 to August 13, 2015.

The total amount of damages that the Court finds just under the circumstances of the case and pursuant to 15 U.S.C. § 1117(a) is therefore $4,323,269.

Since Covertech elected the award of statutory damages in the event that such damages would be higher than the above-calculated damages, the Court will now consider the amount of statutory damages that can be awarded. The statute provides the following:

> In a case involving the use of a counterfeit mark (as defined in section 1116 (d) of this title) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a) of this section, an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of—
> (1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or
> (2) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

15 U.S.C. § 1117(c).

The Court found above that TVM had willfully used a counterfeit mark by using Covertech's rFOIL and CONCRETE BARRIER marks. The Court is unable to determine what amount of TVM's sales to the metal building industry is attributable to rFOIL and CONCRETE BARRIER. However, an award of statutory damages would be justified in this case. The Court may award up to $2,000,000 for rFOIL and CONCRETE BARRIER respectively, because the use of the counterfeit mark was willful pursuant to 15 U.S.C. § 1117(c)(2), resulting in a total of $4,000,000.

The Court further assesses 3% prejudgment interest on the above amount. The total prejudgment interest for the time period between May 28, 2013 and August 13, 2015 is $265,261. The total amount that the Court may award under 15 U.S.C. § 1117(c) is therefore $4,265,315.

As noted above, Covertech requested that the Court award either damages pursuant to 15 U.S.C. §§ 1117(a) and (b), or statutory damages, whichever amount was higher. Since the Court's damages calculation is higher than its statutory damages calculation, the Court will award damages under 15 U.S.C. § 1117(a) in the amount of $4,323,269.

Regarding the sales of ULTRA NT RADIANT BARRIER, the Court finds that 50% of TVM's sales figure of $369,014 shall be awarded in damages, resulting in an amount of $184,507. The Court finds this amount to be just under the circumstances of the case. In addition, the Court hereby awards 3% in prejudgment interest, resulting in an amount of $12,238.

The total amount of damages that the Court will award to Covertech for TVM's trademark infringement and unfair competition is $4,520,014.

The Court also finds that the manner in which TVM benefited from the reputation of Covertech's marks in the marketplace in order to promote its own mark makes this case stand out from others. *See Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 314 (3d Cir. 2014). Based on the exceptional nature of this case, the Court will consider Covertech's motion for attorney's fees in accordance with Rule 54 of the Federal Rules of Civil Procedure and the Lanham Act. This motion may include any attorney's fees relating to

Covertech's efforts to register the mark and to have TVM's registration of ULTRA NT RADIANT BARRIER cancelled.

### g. TVM's Fraud on the USPTO

The Lanham Act provides that any person who procures "registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof." 15 U.S.C. §1120. "To demonstrate that a federal registration was fraudulently procured, . . . a challenging party must adduce evidence that the registrant actually knew or believed that someone else had a right to the mark." *Marshak v. Treadwell*, 240 F.3d 184, 196 (3d Cir. 2001) (citations omitted).

A third party may petition to cancel a registered trademark on the ground that the "registration was obtained fraudulently." *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009), citing 15 U.S.C. § 1064(3).

> Fraud in procuring a trademark registration or renewal occurs when an applicant knowingly makes false, material representations of fact in connection with his application. A party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy burden of proof. Indeed, the very nature of the charge of fraud requires that it be proven "to the hilt" with clear and convincing evidence. There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party.

*Id.* (internal citations and quotations omitted). Mere negligence or gross negligence are not sufficient to infer fraud or dishonesty. *See id.* "[A] trademark is obtained fraudulently under the Lanham Act only if the applicant or registrant knowingly makes a false,

material representation with the intent to deceive the PTO." *Id.* Subjective intent to deceive is an indispensable element in the analysis. *Id.*

> Because direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence. But such evidence must still be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement. When drawing an inference of intent, "the involved conduct, viewed in light of all the evidence . . . must indicate sufficient culpability to require a finding of intent to deceive.

*Id.* (internal citations omitted).

The registration at issue here is the application to register the ULTRA NT RADIANT BARRIER trademark submitted by TVM on March 30, 2011. (ECF No. 97 at 85). Mr. Boulding submitted a declaration that he electronically signed on September 9, 2011 containing three relevant statements: (1) that TVM first used the mark in 2006; (2) that he believed that TVM was the owner of the mark; and (3) that he believed no one else had the right to use the mark. (*Id.*).

The Court found above that TVM had been buying ULTRA NT RADIANT BARRIER from Covertech at least as early as 2003. (*Id.*). This finding was based on invoices provided by Covertech showing TVM's purchases from Covertech. (Ex. 5). Thus, Mr. Boulding's first statement that TVM first used the mark in 2006 is clearly false. The Court refuses to lend credence to Defendant's suggestion that the incorrect year merely constituted a "typo." (ECF No. 96 at 75).

Additionally, Mr. Boulding's statement attested that he owned the mark. Defendant argues that this was a true statement because TVM created the marks ULTRA

NT RADIANT BARRIER and ULTRA NT SCIF BARRIER, and was the first entity to use the marks in commerce in the United States. (ECF No. 96 at 76).

To establish prior use for a common law mark, distribution of the mark need not be wide-spread, but it must be of a public nature and more than de minimis. *Lucent Info. Mgmt., Inc. v. Lucent Technologies, Inc.*, 186 F.3d 311, 319 (3d Cir. 1999) (citing *Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350 (6th Cir.1998); *Kathreiner's Malzkaffee Fabriken Mit Beschraenkter Haftung v. Pastor Kneipp Medicine Co.*, 82 F. 321 (7th Cir.1897) (common law rights obtained by foreign company which had sent five test shipments to companies and individuals in the United States)).

Covertech has satisfied the Court that its prior sale of ULTRA NT RADIANT BARRIER to TVM was of a public nature and establishes its ownership of the mark. Thus, the Court finds that Mr. Boulding's claim that he owned the mark on his trademark registration application was false. The Court also found above that Covertech had in fact developed and used the ULTRA NT RADIANT BARRIER brand. (ECF No. 87, Trial Tr., at 106:7–17). Thus, the Court finds that Covertech was the actual owner of the ULTRA NT RADIANT BARRIER mark, and that Mr. Boulding's second statement in the application regarding ownership was false.

Finally, Mr. Boulding made a statement in his application that he believed that no one else had a right to use the mark. The Court also finds this statement to be false, since the Court's above conclusions establish that Covertech had a right to use the mark. In light of Mr. Boulding's prior interactions with Covertech, he must have known or

believed that Covertech had a right to use the mark. *See Marshak v. Treadwell*, 240 F.3d at 196.

The Court finds that Mr. Boulding's testimony at trial on this issue was not credible. Though TVM claims that Mr. Boulding was merely mistaken when he provided incorrect information to the USPTO, the Court finds that Mr. Boulding's statements amounted to more than a simple oversight. Mr. Boulding signed a declaration specifically stating that he had read the application and signed it under penalty of perjury. Mr. Boulding should have made an effort to ensure that the information he provided in the application was correct. Mr. Boulding knowingly submitted a false statement to the USPTO, and TVM is therefore liable for fraud on the USPTO. There is no evidence upon which Mr. Boulding could base his belief that Covertech had abandoned the mark, particularly in light of TVM's prior relationship with Covertech, and the fact that Mr. Boulding knew how successful the mark had been in the United States. TVM presented no evidence to show that Mr. Boulding had made inquiries to determine whether Covertech had abandoned the mark. It appears to the Court that TVM simply tried to take advantage of Covertech's failure to register the mark as a trademark in the United States.

The Court finds that TVM's ULTRA NT RADIANT BARRIER trademark was obtained fraudulently under the Lanham Act and that Mr. Boulding knowingly made a false, material representation with the intent to deceive the USPTO. TVM is therefore liable for fraud on the USPTO.

### h.  Remedy for Fraud on the USPTO

The Lanham Act gives the Court the power to address fraudulently obtained registrations, including the power to cancel the or otherwise rectify the registry at the USPTO:

> In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

15 U.S.C. § 1119.

The Court finds that the ULTRA NT RADIANT BARRIER mark rightfully belongs to Covertech. The Court will therefore order the cancellation of TVM's registration of the ULTRA NT RADIANT BARRIER mark.

The Act further provides that when a mark was registered fraudulently, the registrant shall be liable for damages:

> Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof.

15 U.S.C. § 1120.

### i.  Breach of Contract – Unpaid Invoices by TVM

Covertech claims that TVM has breached the contract between the parties by failing to pay certain invoices for product that they purchased. An action for breach of contract requires proof of the following three elements:

97

(1) the existence of a contract, including its essential terms;
(2) a breach of a duty imposed by the contract; and
(3) resultant damages.

*See, e.g., Corestates Bank v. Cutillo*, 1999 PA Super 14, 723 A.2d 1053, 1058 (Pa. Super. 1999);

*Gorski v. Smith*, 812 A.2d 683, 692 (Pa. Super. Ct. 2002).

"Under Pennsylvania law, the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." *Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 298–99 (3d Cir. 1986) (citations omitted). There must also be consideration on both sides. *See id.* "Consideration 'confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise.'" *Id.* (citing *Curry v. Estate of Thompson*, 481 A.2d 658, 661 (1984)).

The object of the inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior. *See Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009) (citations omitted). Therefore, a true and actual meeting of the minds is not necessary to form a contract. *See id.*

The Court must determine whether or not the evidence presented at trial was sufficient to prove the existence of a contract between Covertech and TVM. In a number of instances testified to by Covertech's Christopher Szymanowski and set forth in Exhibit 40, TVM did not pay what it owed to Covertech after it had ordered and received the

product. (ECF No. 91 at 96–97). Covertech claims that TVM is liable regarding unpaid invoices for a total of $228,305.17.

TVM denies that it is liable to Covertech for these unpaid invoices. TVM claims that under the agreement it had reached with Covertech, TVM was told not to pay any of the disputed invoices until the dispute was resolved. (ECF No. 96 at 77). TVM argues that "[m]uch, if not all of the product that has not been paid for by TVM was subject to disputes resulting from disagreements over warranty claims and credits." (*Id.*). TVM claims that it was in fact in compliance with the terms of that contract. (*Id.*). Covertech denies that TVM has established that Covertech owes it any money for the outstanding credit requests for warranty claims, and even if it had, that such claims are time-barred. (ECF No. 97 at 91).

The only evidence that TVM cites in support of the fact that it was not obligated to pay disputed invoices is testimony by Mr. Boulding at trial. TVM states that "[i]f TVM had any dispute with an invoice from Covertech, TVM was told by Covertech not to pay it, even if it was a $1.00. TVM was not to pay the invoice until the dispute was resolved. Normal practice would dictate just not paying the portion in dispute." (ECF No. 96 at 26, citing Vol. 4, Boulding, pg. 146). This is insufficient evidence to support a finding that this was in fact a part of the agreement between Covertech and TVM. Covertech's employees did not testify that such were the terms of the agreement.

Based on the evidence presented at trial, it is difficult for the Court to discern the precise terms of the agreement between Covertech and TVM. However, the Court finds that Covertech and TVM entered into an agreement whereby TVM would order reflective

insulation from Covertech, which Covertech would ship to TVM and TVM would then pay for. The Court finds that TVM breached its duty by failing to pay Covertech for the product it received, and that Covertech suffered damage in the form of failing to receive the money it was owed in return for the product it shipped. Thus, TVM is liable to Covertech for breach of contract.

### j. Remedy for Unpaid Invoices

Mr. Boulding admitted at trial that TVM had not paid the invoices and he asserted that the amount owed to Covertech was offset by various credit requests submitted by TVM for warranty claims. The Court finds that TVM did not establish that Covertech owes it any money for those credit requests. Even if it had, the Court finds those claims to be time-barred. TVM is therefore liable to Covertech regarding these unpaid invoices for a total of $228,305.

### k. Breach of Contract – Settlements Not Paid by TVM

Covertech also asserts a claim for breach of contract on the basis that TVM failed to pay its agreed portion of settlements to resolve warranty claims for allegedly defective insulation submitted by Southern Structures, Acadian, Halpin's, and Marquis. (ECF No. 97 at 91). Although Mr. Boulding asserted that this amount was offset by a separate $15,000 claim that TVM allegedly paid, Covertech argues that TVM provided no information or documents to support that assertion. (*Id.*).

TVM counters that TVM and Covertech's agreement to both pay a percentage of all warranty claims was later altered so that TVM would pay the entirety of certain other

claims in order to compensate Covertech for the claims it had paid in full. (ECF No. 96 at 77–78). TVM therefore claims that it is not liable to Covertech for breach of contract because the subsequent modification of the arrangement between the parties relieved TVM of its duty to pay the warranty claims made by Southern Structures, LLC, Arcadian Commercial, LLC, Halpin's Flooring America, Marquis Building, and Dayon. TVM has failed to provide the Court with evidence that the parties in fact agreed to modify their contract for contribution in this manner. The alleged modification is therefore not a defense to this breach of contract claim.

The evidence put forward by Covertech in support of its agreement with TVM that TVM had agreed to pay a portion of those settlements is in the form of testimony by Chris Szymanowski at trial, who serves as Covertech's accountant. (ECF No. 97 at 39). Mr. Szymanowski also relied on Exs. 21, 22, and 23, which show that TVM agreed to pay a portion of those settlements, that Covertech then paid the settlements to the claimants and obtained releases, and that Covertech invoiced TVM for its portion of the settlement. (*Id.*, citing Tr., Szymanowski, 10/21 at 235:2–240:2, Exs. 21-23). Though Mr. Boulding admitted at trial that TVM had not made the reimbursements to Covertech, he argued that instead, TVM had paid an entire claim for $15,000. However, he was unable to recall to whom the claim was paid. (ECF No. 97 at 40, citing Tr., Boulding, 10/22 at 220:14-15). The Court does not find Mr. Boulding's assertion to have been credible, particularly since TVM did not adduce any evidence that it had paid another claim in the amount of $15,000. In addition, the Court deems Mr. Szymanowski's statements at trial to be credible, and finds that the

parties did agree that TVM would make contributions towards the warranty claims paid by Covertech.

The Court finds that TVM breached its contract with Covertech by failing to pay its contribution to Covertech for the warranty claims. As a result, Covertech suffered loss in the amount that TVM failed to reimburse them. TVM is therefore liable for breach of contract for failing to pay the settlement amounts.

### l. Remedy for Breach of Contract – Settlements not Paid by TVM

In reliance on Covertech's agreement with TVM, Covertech paid settlements to Southern Structures, Acadian, Halpin's, and Marquis, obtained releases from them and invoiced TVM for the amounts it had agreed to contribute, which total $13,000. TVM has not paid that amount to Covertech. Though TVM asserted at trial that this amount was offset by a separate $15,000 claim that TVM had allegedly paid, TVM provided no information or documents in support of that assertion. TVM also presented no evidence of an agreement with Covertech that the $15,000 would offset the other money that TVM owed to Covertech.

The Court therefore finds that TVM is liable to Covertech regarding these settlement agreements for a total of $13,000.

### m. Unjust Enrichment

The elements of unjust enrichment under Pennsylvania law have been defined as:

> (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.

*Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 180 (3d Cir. 2008), citing *Limbach Co. LLC v. City of Philadelphia*, 905 A.2d 567, 575 (Pa.Cmwlth.2006).

Under Pennsylvania law, a contract prevents a party from making a claim of unjust enrichment. Recovery in such a case is limited to the measure provided for in the contract. *United States v. Kensington Hosp.*, 760 F. Supp. 1120, 1135 (E.D. Pa. 1991), citing *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir.1987).

Since the Court has found that Plaintiff is able to recover under a breach of contract theory, it need not consider Plaintiff's unjust enrichment arguments.

### n. TVM's Counterclaims

### i. Declaratory Judgment

TVM seeks a declaratory judgment and asks the Court to determine that CONCRETE BARRIER is a generic mark. TVM asserts that CONCRETE BARRIER is not protectable as a mark because it simply describes what the product is, namely a barrier between a concrete slab and the soil underneath it. (ECF No. 96 at 79). TVM argues that even if CONCRETE BARRIER was once indicative of its source, it is now used by a number of manufacturers, distributors and retailers, not all of whom are supplied by Covertech, which is further indication that CONCRETE BARRIER cannot be indicative of a single source of the product, and is therefore not a protectable mark. (*Id.* at 80). TVM adds that Covertech allowed several of its distributor and retail customers to use the mark, or some variation thereof, without any indication that the product ultimately originated from Covertech. (*Id.*). TVM claims that Covertech acquiesced and even assisted

in the dilution and genericity of its CONCRETE BARRIER mark by allowing some of its customers to use the product in this way. (*Id.*). Further, TVM argues that Covertech's failure to protect its mark for six years means that it has lost the mark's legal protection. (*Id.*).

The Court determined above that CONCRETE BARRIER was entitled to trademark protection because it had attained secondary meaning and consumers in the market associated it with a product from Covertech. In making this determination, the Court also found that any use of the mark by other distributors was either authorized by Covertech or unauthorized use by TVM. Thus, TVM has failed to establish to the Court that the trademark has become generic and not protectable. TVM's declaratory judgment claim therefore fails.

### ii. Breach of Contract and Unjust Enrichment

TVM asserts that Covertech is liable to TVM for breach of contract or, in the event the Court should find that there was no contract between the parties, for unjust enrichment. (ECF No. 96 at 83, 84). TVM claims that they entered into an ancillary contract with Covertech in which Covertech agreed to reimburse TVM at a later date for Covertech's share of warranty claims totaling $99,673.42 if TVM paid the entire amount at the time. (*Id.* at 83). TVM accepted the offer and paid the claims. (*Id.*). According to TVM, Covertech made the reimbursement in Canadian funds rather than American dollars, resulting in Covertech still owing TVM $14,951.01 from these claims. In addition, TVM asserts that it agreed with Covertech that TVM would pay $231,161.19 in warranty claims submitted to TVM on claims made against Covertech's product warranty in exchange for

Covertech reimbursing TVM at a later date. (*Id.* at 84). TVM claims that Covertech has failed to reimburse TVM for payment of these claims. (*Id.*). Finally, TVM asserts that Covertech only reimbursed TVM for $44,614.77 for a credit request totaling $82,880.00. (*Id.*).

TVM has not presented the Court with credible evidence that Covertech had agreed to reimburse TVM for these credit requests, other than testimony by TVM's Mike Boulding. The Court has judged Mr. Boulding's testimony not to be credible overall based on numerous impeachments by Plaintiff at trial. Thus, the Court finds insufficient evidence to support a finding that Covertech had agreed to reimburse TVM for the amount alleged. Covertech is not liable to TVM for breach of contract for failure to pay these amounts.

### iii.  Fraudulent Concealment

For the doctrine of fraudulent concealment to be applicable, a defendant must have committed some affirmative independent act of concealment upon which a plaintiff justifiably relied. *Krapf v. St. Luke's Hosp.*, 4 A.3d 642, 650 (Pa. Super. Ct. 2010).

TVM asserts that Covertech committed fraud in failing to disclose to TVM knowledge about the potential degradation of the rFOIL product when exposed to UV light. (ECF No. 97 at 96).  Covertech argues that the inherent fraud doctrine does not toll the statute of limitations here because TVM should have learned through the exercise of due diligence of the existence of the claim. (*Id.* at 98). Because TVM should have learned of the cause of action at least as early as 2010, Covertech argues that the claim is barred under Pennsylvania's two-year statute of limitations. (*Id.* at 99). Covertech also asserts

that even if the claim was not time-barred, TVM did not establish that Covertech committed fraud. (*Id.* at 99). Covertech notes that Mr. Orologio's statement that he had known since 2004 and possibly as early as the 1990's that UV light could damage polyethylene film was made in the context of his experience in the pool covering industry, and that he did not know in 2004 that rFOIL as installed inside an exposed building could similarly degrade after enough exposure. (*Id.* at 100). Covertech argues that to the extent Mr. Boulding's testimony conflicts with Mr. Orologio's testimony, the Court should find that Mr. Boulding's testimony was not credible. (ECF No. 97 at 101). Covertech further asserts that TVM has failed to demonstrate that it was damaged as a result of reliance on statements by Mr. Orologio, and that TVM failed to prove the damages with a reasonable degree of certainty. (*Id.* at 102). Finally, Covertech argues that TVM's fraud claim is barred by the broad release that TVM entered into following the *Mueller* litigation. (*Id.* at 104).

TVM claims that Covertech had a duty "to disclose to TVM a development or discovery that would make one of the products it sells to TVM unsuitable for an industry, application, or market, to which TVM, and Covertech through TVM, were currently selling." (ECF No. 96 at 87). TVM claims that between the time when Covertech learned that its reflective insulation products were unsuitable for these applications in 2004, until the time that TVM learned of it, TVM sold millions of dollars of product for applications for which the product was unsuitable. (*Id.* at 95). TVM further asserts that Covertech had a duty to disclose to TVM that reflective insulation was not suitable for any application where there was any type of exposure to UV light because TVM relied on Covertech as its only source of technical information for reflective insulation products, because TVM

ceded essential parts of its business to Covertech, Covertech had told TVM in 1998 or 1999 that this product was suitable for applications in which it was exposed to UV light and Covertech later learned this was not the case. (*Id.* at 90). Finally, TVM argues that Covertech had a duty to disclose because TVM's 2005 Urgent Notice was, under Covertech's knowledge at that point, ambiguous, and Covertech's approval of that Urgent Notice under those circumstances required Covertech to clarify TVM's understanding. (*Id.*).

The Court finds that Covertech is not liable to TVM for fraud. TVM has failed to establish that Covertech was aware as early as 2004 of the specific risks of using polyethylene in enclosed buildings. TVM has not satisfied the Court that Covertech made any affirmative independent act of concealment upon which TVM relied. *See Krapf v. St. Luke's Hosp.*, 4 A.3d at 650. The Court finds that Mr. Orologio's testimony is credible and that Covertech provided a valid explanation for Mr. Orologio's familiarity with UV degradation in 2004 due to his experience in the pool covering business. In addition, the Court finds that TVM has not established the damages it asserts it has suffered with a reasonable degree of certainty.

### iv. Misappropriation

TVM also argues that Covertech is liable to TVM for misappropriation because TVM created the product numbers and marketing materials with little or no contribution from Covertech. (ECF No. 96 at 92). TVM claims that it provided the numbers to Covertech so that the two companies, who were in a confidential relationship at the time, could integrate their systems. (*Id.* at 92). TVM asserts that it never allowed Covertech to

use their marketing materials after the agreement between them ended. (*Id.* at 93). Covertech responds that TVM has failed to establish the elements of misappropriation, and that the claim is also time-barred. (ECF No. 97 at 106).

The Court finds that TVM has failed to make out a claim for misappropriation. TVM has failed to establish what was misappropriated. TVM has also failed to establish the second element, namely that "the defendant has appropriated the thing at little or no cost, such that the court can characterize defendant's own actions as reaping where it has not sown." *See Babiarz v. Bell Atlantic-Penn., Inc.*, 2001 Phila. Ct. Com. Pl. LEXIS 94, 27-28 (Pa. C.P. 2001) (*quoting Sorbee Int'l. Ltd. v. Chubb Custom Ins. Co.*, 1999 PA Super 178, 735 A.2d 712, 716 (Pa. Super.Ct. 1999)). Covertech had agreed with TVM that TVM would be its marketing arm in the United States. The parties agreed to come up with the product numbers in order to eliminate confusion among customers. TVM has not produced any evidence as to how it was injured by the alleged misappropriation, or to establish that Covertech had reaped something it had not sown.

### v. Trademark Infringement and Fraud on the Trademark Office

Lastly, TVM has alleged that Covertech committed trademark infringement and fraud on the trademark office. TVM argues that Covertech uses the "ULTRA NT SCIF BARRIER" marks in commerce without TVM's approval. (ECF No. 96 at 93). Covertech counters that the mark is invalid and that Covertech is not liable to TVM for trademark infringement of that mark. (ECF No. 97 at 109). Covertech also denies that Covertech and Mr. Starr committed fraud on the USPTO because there was no evidence that they

knowingly made a false, material representation with the intent to deceive the USPTO. (ECF No. 97 at 110).

TVM notes that it has federally registered "ULTRA NT RADIANT BARRIER" and "ULTRA NT SCIF BARRIER." (ECF No. 96 at 93). TVM also claims that the registration of these marks was proper because TVM was the first to use them in commerce in the United States. (*Id.*). The Court found above that Covertech owned the ULTRA NT RADIANT BARRIER mark. The Court also found that TVM had committed fraud on the trademark office by registering the mark. Thus, the Court finds that TVM's trademark infringement claim for use of the ULTRA NT RADIANT BARRIER mark fails.

TVM claims that Covertech committed fraud on the USPTO by submitting an application to the USPTO swearing that it owned the mark, even though Covertech allegedly knew that TVM had registered the mark and that TVM owned the mark because of first use. (ECF No. 96 at 94). TVM asserts that "Covertech engaged in this willful false statement in an attempt to deceive the Patent and Trademark Office into giving Covertech approval of its application to register the mark." (ECF No. 96 at 94).

TVM's fraud on the USPTO equally fails. Since the Court found above that Covertech was the rightful owner of ULTRA NT RADIANT BARRIER, and that TVM's registration of the mark with the USPTO was fraudulent, the Court finds that Covertech was entitled to use of the mark. The Court also finds that Covertech owned the mark because of its first use in interstate commerce, and that Covertech was not making a willful false statement in its application to the USPTO.

**VI. CONCLUSION**

For all of the foregoing reasons, the Court finds in favor of Covertech on all counts. Judgment is entered in favor of Covertech. The Court hereby awards damages to Covertech in the amount of $4,761,319. The Court also orders the cancellation of TVM's registration of the ULTRA NT RADIANT BARRIER mark. The Court will also entertain Covertech's motion for attorney's fees in an amount relating to its efforts in pursuing the trademark infringement, unfair competition, and fraudulent trademark registration claims.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COVERTECH FABRICATING, INC.,** | ) | |
| | ) | **CIVIL ACTION NO. 3:13-150** |
| **Plaintiff,** | ) | |
| | ) | **JUDGE KIM R. GIBSON** |
| **v.** | ) | |
| | ) | |
| **TVM BUILDING PRODUCTS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

AND NOW, this __14th__ day of August, 2015, the Court having conducted a nonjury trial on Covertech Fabricating, Inc.'s claims against TVM Building Products, Inc., and TVM Building Products, Inc.'s counterclaims thereto, in consideration of the parties having filed their Proposed Findings of Fact and Conclusions of Law (ECF Nos. 96 and 97), and in accordance with the foregoing Memorandum Opinion, **IT IS HEREBY ORDERED** that Plaintiff's request for relief is **GRANTED** as follows:

1. The Court orders TVM Building Products, Inc. to pay damages to Covertech Fabricating, Inc. in the amount of $4,761,319.

2. The Court also orders cancellation of TVM Building Products, Inc.'s registration of the ULTRA NT RADIANT BARRIER mark.

3. The Court will also entertain Covertech Fabricating, Inc.'s motion for attorney's fees in an amount relating to its efforts in pursuing the trademark infringement, unfair competition, and fraudulent trademark registration claims. The claim for attorney's fees shall be submitted to this Court within twenty-one (21) days of the date of this Order and the response by Defendant to that claim shall be filed within twenty-one (21) days of the date of filing the claim for attorney's fees.

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE